J-A01025-21

2021 PA Super 180

| | | |
|---|---|---|
| PETER HUMPHREY, YU YINGZENG, AND CHINA WHYS COMPANY LTD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GLAXOSMITHKLINE PLC AND GLAXOSMITHKLINE LLC | : | No. 1145 EDA 2020 |
| | : | |
| Appellant | : | |

Appeal from the Order Entered February 12, 2020
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 181003237

BEFORE:   BENDER, P.J.E., OLSON, J., and STRASSBURGER, J.[*]

OPINION BY OLSON, J.:                    **FILED SEPTEMBER 3, 2021**

Appellants, GlaxoSmithKline PLC ("GSK PLC") and GlaxoSmithKline LLC ("GSK LLC"), appeal from the order entered on February 12, 2020, which overruled their preliminary objection to compel arbitration.  We affirm.

Peter Humphrey, Yu Yingzeng, and ChinaWhys Co. Ltd. (collectively "Plaintiffs") filed this action against Appellants.  Within their amended complaint, Plaintiffs alleged and averred the following.

Humphrey and Yu are a married couple and are co-founders of ChinaWhys Co. Ltd. ("ChinaWhys Co.").  ChinaWhys Co. provides "risk management advice and consulting services [in China], primarily focused on the prevention and exposure of internal corruption and fraud within multinational companies."  Plaintiffs' Amended Complaint, 12/17/18, at

_____

[*] Retired Senior Judge assigned to the Superior Court.

¶¶ 6-8. GSK PLC is a global pharmaceutical company. GSK LLC is a wholly owned subsidiary of GSK PLC and has its principal place of business in Philadelphia. *Id.* at ¶ 9. Non-party GlaxoSmithKline (China) Investment Co., Ltd ("GSK China") is a wholly owned subsidiary of GSK PLC and operates in China. *See id.* at ¶ 9. "At all relevant times, [GSK PLC] had the right to and did exercise control over the actions of its wholly-owned subsidiaries [GSK China] and GSK LLC." *Id.*

"[F]rom at least 2010, [Appellants participated] in widespread bribery in China," with the intention of increasing their pharmaceutical sales. *Id.* at ¶ 21. In December 2011, an anonymous whistleblower who worked for Appellants began sending information to Chinese regulators, "describing the widespread fraud and corruption within" Appellants' organization. *Id.* at ¶ 25. Appellants came to believe that the whistleblower was an individual named Vivian Shi, who was the head of government affairs for GSK China. *Id.* at ¶ 49. As a result, Appellants fired Shi for a pretextual reason. *Id.* at ¶ 50.

In April 2013, Appellants approached Humphrey and asked that ChinaWhys Co. "conduct a background investigation on Shi." *See id.* at ¶¶ 9, 48, and 59. To convince Humphrey to investigate Shi, Appellants told Humphrey that Shi's whistleblower accusations were false. *Id.* at ¶ 50. According to Plaintiffs' amended complaint, however, Appellants knew that the whistleblower accusations were not false, as Appellants knew that they "orchestrated and condoned the illegal conduct that was the subject of the allegations." *Id.* at ¶ 122. Plaintiffs claimed that Appellants secretly wanted

ChinaWhys Co. to conduct the background investigation on Shi "to bolster the false assertion that she was an extortionist making false claims[, so that Appellants could] hide the truth about the [whistleblower] allegations." *Id.* at ¶ 123. Appellants also failed to inform Plaintiffs that "Shi had powerful unidentified allies within the [Chinese] Communist Party elite in Shanghai and that it was therefore extremely dangerous to investigate her." *Id.* at ¶ 51.

Based upon Appellants' alleged misrepresentations and omissions, Plaintiffs agreed to "conduct an information search on Shi and assess the risk she could pose to [Appellants] through her supposed smear campaign." *Id.* at ¶ 60. Plaintiffs investigated Shi's background and, on June 6, 2013, Plaintiffs submitted their investigative report to Appellants. *Id.* at ¶ 68.

On July 1, 2013, the Chief Executive Officer ("CEO") of GSK China informed Humphrey that Shi had "read your report and she will be coming after you." *Id.* at ¶ 85. On July 10, 2013, Shanghai police raided both ChinaWhys Co.'s office and the Beijing home shared by Humphrey and Yu. *Id.* at ¶ 89. The Shanghai police detained Humphrey and Yu and, following their formal arrests, Humphrey and Yu were tried in China and convicted of crimes related to their investigation into Shi. *See id.* at ¶ 95.

On August 8, 2014, Humphrey was sentenced to serve two-and-one-half years in prison; Yu was sentenced to serve two years in prison. *Id.* Humphrey and Yu were then transferred to separate prisons in Shanghai, where they "suffered from a wide range of maltreatment ranging from passive denial and ignorance of requests for basic needs, to active and aggressive cruelty at the

- 3 -

hands of prison guards." *Id.* at ¶ 96. Further, while Humphrey and Yu were in prison, Appellants made misleading statements that "prolonged Humphrey and Yu's incarceration." *Id.* at ¶ 112.

Plaintiffs pleaded four causes of action in their amended complaint: fraud, intentional infliction of emotional distress, negligent infliction of emotional distress, and civil conspiracy. Plaintiffs sought damages related to the arrest and imprisonment of Humphrey and Yu and the destruction of their ChinaWhys Co. business. *See id.* at ¶¶ 120-143.

On September 10, 2019, Appellants filed preliminary objections in the nature of a petition to compel arbitration. Within their preliminary objections, Appellants claimed that Plaintiffs contractually agreed to arbitrate all of their claims against Appellants. In support of their preliminary objections, Appellants averred that, in April 2013, GSK China officials requested that non-party ChinaWhys (Shanghai) Consulting Co. Ltd. (hereinafter "ChinaWhys Consulting Co.") conduct a background investigation on Shi. *See* Appellants' Preliminary Objections, 9/10/19, at ¶ 3. According to Appellants, Plaintiffs "agreed to be retained by GSK China, and Humphrey signed a formal retention agreement, titled a Consultancy Agreement, on behalf of" ChinaWhys Consulting Co. *Id.* at ¶ 6. The Consultancy Agreement between GSK China and ChinaWhys Consulting Co. contains an arbitration clause, which provides:

> This Agreement shall be governed in all respects by the laws of the People's Republic of China. All disputes arising out of or in connection with this Agreement shall be settled through friendly consultation between both parties. In case no settlement can be reached, either Party may submit the

dispute to the China International Economic and Trade Arbitration Commission ("CIETAC") in Beijing for arbitration in accordance with the CIETAC rules of arbitration then in effect. The arbitration award shall be final and binding on the Parties.

Consultancy Agreement, dated 4/26/13, at ¶ 11.

Appellants claimed that, even though Plaintiffs strategically chose not to name GSK China as a defendant or ChinaWhys Consulting Co. as a plaintiff, the arbitration clause in the Consultancy Agreement was still enforceable against Plaintiffs, as Plaintiffs' claims constituted a "dispute[] arising out of or in connection with" the Consultancy Agreement. **See** Appellants' Memorandum of Law in Support of Preliminary Objections, 9/10/19, at 3.

Plaintiffs responded to the preliminary objections and claimed that they were not bound by the arbitration agreement because neither Plaintiffs nor Appellants were signatories to the agreement. **See** Plaintiffs' Memorandum in Opposition to Preliminary Objections, 10/25/19, at 12. Further, Plaintiffs argued that the trial court should overrule the preliminary objections, as their claims did not fall within the scope of the arbitration clause. **See id.** at 21.

On February 12, 2020, the trial court overruled Appellants' preliminary objection seeking to compel arbitration. Trial Court Order, 2/12/20, at 1. As the trial court explained, it overruled the preliminary objection because "[n]one of the parties to this suit are signatories to the agreement under which [Appellants] seek to compel arbitration" and because the dispute is not within the scope of the arbitration agreement. Trial Court Opinion, 2/12/20, at 5 and 12 n.7.

Appellants filed a timely notice of appeal.[1]  They raise two claims to this

Court:

> 1. May [Appellants], affiliates of one contracting party, compel arbitration against Plaintiffs, an affiliate and two agents of the other contracting party, where Plaintiffs' claims arise from, and would not exist but for, the contract containing the arbitration agreement?
>
> 2. Does an agreement to arbitrate "all disputes arising out of or in connection with" a contract cover Plaintiffs' claims based on alleged misrepresentations that induced them to agree to the contract and other alleged misrepresentations about the work they performed because of the contract, and where the parties would not have had the relationship described in the complaint but for the contract?

Appellants' Brief at 2-3.

We have explained:

> Our review of a claim that the trial court improperly [overruled] the appellant's preliminary objections in the nature of a petition to compel arbitration is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in [overruling the preliminary objections]. In doing so, we employ a two-part test to determine whether the trial court should have compelled arbitration. First, we examine whether a valid agreement to arbitrate exists. Second, we must determine whether the dispute is within the scope of the agreement.  . . . If the two-part test results in affirmative answers, then the controversy must be submitted to arbitration.  . . .

---

[1] "An order overruling preliminary objections seeking to compel arbitration is immediately appealable as an interlocutory appeal as of right pursuant to 42 Pa.C.S.A. § 7320(a) and Pa.R.A.P. 311(a)(8)."  ***Cardinal v. Kindred Healthcare, Inc.***, 155 A.3d 46, 49 n.1 (Pa. Super. 2017).

Whether a claim is within the scope of an arbitration provision is a matter of contract, and as with all questions of law, our [standard of review is *de novo* and our scope of review is plenary]. In making these determinations, courts must bear in mind: (1) arbitration agreements are to be strictly construed and not extended by implication; and (2) when parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive assurance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute. To resolve this tension, courts should apply the rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.

*TTSP Corp. v. Rose Corp.*, 217 A.3d 1269, 1280 (Pa. Super. 2019) (quotations and citations omitted).

"Pennsylvania has a well-established public policy that favors arbitration, and this policy aligns with the federal approach expressed in the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (FAA)." *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 660 (Pa. Super. 2013). "This policy applies equally to all arbitration agreements." *MacPherson v. Magee Mem'l Hosp. for Convalescence*, 128 A.3d 1209, 1219 (Pa. Super. 2015) (*en banc*).

Nevertheless, the policy favoring arbitration "was not intended to render arbitration agreements more enforceable than other contracts, and the FAA [was not] designed to preempt all state law related to arbitration." *Pisano*, 77 A.3d at 661 (quotations and citations omitted). "Thus, when addressing the specific issue of whether there is a valid agreement to arbitrate, courts

generally should apply ordinary state-law principles that govern the formation of contracts, but in doing so, must give due regard to the federal policy favoring arbitration." *Id.* (quotations and citations omitted).

The trial court initially overruled Appellants' preliminary objection seeking to compel arbitration because, the trial court concluded, "[n]one of the parties to this suit are signatories to the agreement under which [Appellants] seek to compel arbitration." Trial Court Opinion, 2/12/20, at 5. On appeal, Appellants acknowledge the fact that no party to this litigation is a signatory to the Consultancy Agreement, which contains the arbitration clause. *See*, *e.g.*, Appellants' Brief at 8-9. Nevertheless, Appellants claim that the trial court erred when it refused to enforce the arbitration clause because, Appellants argue, there is an "obvious and close nexus" between each party and "either the contract itself or the contracting parties." *Id.* at 18-19 (quotations and citations omitted).

Regarding the non-signatory Appellants (who seek to enforce the arbitration clause), Appellants claim that an "obvious and close nexus" exists between themselves and GSK China (the signatory to the Consultancy Agreement) because Appellants and GSK China are "members of the same corporate family" and because Plaintiffs' claims "attribute GSK China's alleged conduct to" Appellants. *Id.* at 19-23. Regarding the non-signatory Plaintiffs (who seek to avoid the arbitration clause), Appellants argue that the same "obvious and close nexus" test must be applied to determine whether Plaintiffs are bound by the arbitration clause. *See* Appellants' Brief at 23-24.

Appellants argue that an "obvious and close nexus" exists between plaintiff ChinaWhys Co. and ChinaWhys Consulting Co. (the signatory to the Consultancy Agreement) because: "[plaintiff] ChinaWhys Co. and ChinaWhys Consulting [Co.] are affiliated entities;" "ChinaWhys Co. proposed to do and actually did all the investigation work called for by the Consultancy Agreement, and it now sues over injuries it allegedly sustained as a result of that engagement;" and, "the claims asserted are based on or inextricably entwined with [the] contract." *Id.* at 26-28. Further, Appellants claim that Humphrey and Yu are bound by the arbitration clause, as Humphrey and Yu are the agents of ChinaWhys Co. and ChinaWhys Consulting Co. and their claims are "based on or inextricably entwined with" the Consultancy Agreement. *Id.* at 29-32.

The FAA "creates substantive federal law regarding the enforceability of arbitration agreements." *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 629-630 (2009). State contract law, however, governs "the scope of agreements (including the question of who is bound by them)."[2] *Id.* at 630. Thus, "traditional principles of state law" govern the issue of whether a contract may "be enforced by or against nonparties to the contract through

---

[2] "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *Id.*

"Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 331 (3rd Cir. 2014). "In general, only parties to an arbitration agreement are subject to arbitration." *Elwyn v. DeLuca*, 48 A.3d 457, 461 (Pa. Super. 2012) (quotations and citations omitted). Nevertheless, a party "can be compelled to arbitrate under an agreement, even if he or she did not sign that agreement, if common law principles of agency and contract support such an obligation on his or her part." *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 294 (3rd Cir. 2004).

Within their brief, Appellants argue that Pennsylvania recognizes an "'obvious and close nexus' doctrine," which "blends various traditional doctrines for binding nonsignatories to contracts, including equitable estoppel, agency, and third-party beneficiary." Appellants' Brief at 10. According to Appellants, the non-signatory Plaintiffs in this case must be compelled to arbitrate their claims because there exists an "obvious and close nexus" between each plaintiff and ChinaWhys Consulting Co., the signatory to the Consultancy Agreement, and between the Plaintiffs' claims and the contract. *See id.* at 11-12. Further, Appellants claim that – regardless of whether a party seeks to enforce or avoid an arbitration clause – the same "obvious and close nexus" test and principles apply. *See id.* at 23-24.

Plaintiffs, on the other hand, argue that Pennsylvania does not recognize an independent "'obvious and close nexus' doctrine."  Plaintiffs' Brief at 37. Rather, Plaintiffs contend, the phrase "obvious and close nexus" is used merely "as short-hand for traditional principles of contract and agency law." *Id.* at 38-39 and 43.  Further, Plaintiffs argue that, under traditional principles of contract and agency law, Appellants cannot compel them to arbitration, as they are non-signatories to the agreement.  *Id.* at 58-66.

In the Pennsylvania state courts, the phrase "obvious and close nexus" first appears in the court of common pleas opinion of *Weiner v. Pritzker*, ___ A.2d ___, 2001 WL 1807929 (Pa.Com.Pl. 2001).  There, the court of common pleas cited an opinion from the Third Circuit Court of Appeals as support for the principle that "non-signatories to an arbitration agreement can enforce such an agreement where there is an obvious and close nexus between the non-signatories and the contract or the contracting parties." *Id.* at *2, *citing* *Dayhoff Inc. v. H.J. Heinz Inc.*, 86 F.3d 1287 (3rd Cir. 1996).[3]

---

[3] Curiously, *Dayhoff* did not use the phrase "obvious and close nexus." Nevertheless, prior to *Weiner*, three opinions from the United States District Court for the Eastern District of Pennsylvania cited *Dayhoff* for the proposition that "non-parties to an arbitration agreement can enforce such an agreement only where there is an obvious and close nexus between the non-parties and the contract or the contracting parties." *Reibstein v. CEDU/Rocky Mountain Acad.*, ___ F.Supp.2d ___, 2000 WL 1858718 (E.D.Pa. 2000) (unpublished memorandum); *see also In re Mushroom Transp. Co.*, 247 B.R. 395, 398 (E.D.Pa. 2000); *Jairett v. First Montauk Sec. Corp.*, 153 F.Supp.2d 562, 581 (E.D.Pa. 2001).

The **Weiner** Court went on to declare that "[o]ne obvious and close nexus is the relationship created between a principal and an agent." **Id.**

This Court first utilized the phrase "obvious and close nexus" in **Dodds v. Pulte Home Corp.**, 909 A.2d 348 (Pa. Super. 2006). In that case, the Dodds sued Pulte Home Corporation of the Delaware Valley ("PHCDV") and its parent corporation, Pulte Home Corporation ("PHC"), for, essentially, breach of contract. **Id.** at 350-351. The Dodds expressly contracted with PHCDV and the contract between the parties contained a broad arbitration clause. **Id.** at 350.

Even though PHC was not a signatory to the underlying contract, both defendants (PHCDV and PHC) moved to compel arbitration and argued that "non-signatories to an arbitration agreement can enforce such an agreement where there is an obvious and close nexus between the non-signatories and the contract or the contracting parties." **Id.** at 351. The Dodds, on the other hand, argued that, despite their signatory status, they were "not bound by the terms of the arbitration agreement" because they sued PHC, a non-signatory to the underlying contract. **Id.**

We agreed with the contention advanced by PHCDV and PHC and clarified that "non-signatories to a contract, such as third-party beneficiaries, may fall within the scope of an arbitration clause if that is the signing parties' intent." **Id.** We further held that the Dodds' claim on appeal failed because:

> In no event could the arbitration clause of PHCDV be defeated by adding PHC to the complaint, and because PHC wishes to **enforce** the arbitration agreement rather than avoid it, [the

Dodds], as signatories to the arbitration agreement, should not be able to avoid the requirement to arbitrate by a non-signatory when the non-signatory **wants** to arbitrate.

*Id.* at 352 (emphasis in original).

We next utilized the phrase "obvious and close nexus" in ***Provenzano v. Ohio Valley General Hospital***, 121 A.3d 1085 (Pa. Super. 2015). In ***Provenzano***, the plaintiff doctor and the defendant hospital entered into an employment agreement, which contained an arbitration clause. *Id.* at 1089. After the hospital and the hospital's board of directors decided not to renew the doctor's employment, the doctor filed a complaint claiming breach of contract against the hospital and violation of Pennsylvania's Wage Payment and Collection Law ("WPCL") against the hospital and the board members. *Id.* at 1092.

Although the board members were not signatories to the employment agreement, the hospital and the board members filed a petition to compel arbitration. *Id.* at 1093. On appeal, we declared that "non-signatories to an arbitration agreement can enforce the agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties." *Id.* at 1097. We further declared that "[o]ne 'obvious and close nexus' between the non-signatories and the contract or the contracting parties arises from the relationship between a signatory principal and a non-signatory agent; if the principal is bound by an arbitration agreement, its agents, employees and representatives are generally likewise bound and can enforce the arbitration agreement, even as non-signatories to

the agreement." *Id.* We then held that the board members were agents of the hospital and, as such, the board members were entitled to "enforce the arbitration clause, even as non-signatories to the employment agreement." *Id.* at 1103.

Our final, published reference to the phrase "obvious and close nexus" occurred in *Saltzman v. Thomas Jefferson University Hospitals*, 166 A.3d 465 (Pa. Super. 2017).[4] In that case, the plaintiff doctor signed an employment agreement with Jefferson Medical Care ("JMC"). The employment agreement contained an arbitration clause. After the plaintiff doctor's employment was terminated, the doctor filed a complaint against defendants JMC and Thomas Jefferson University Hospitals ("TJUH"), claiming retaliation in violation of the Pennsylvania Whistleblower Law. Although TJUH was not a party to the employment contract between the doctor and JMC, both TJUH and JMC filed a petition to compel arbitration. *Id.* at 468-469.

On appeal, we declared that "a non-signatory to an arbitration agreement can enforce the agreement if there is an 'obvious and close nexus' between the non-signatory and either the contract itself or the contracting parties." *Id.* at 469 n.2. We noted the plaintiff doctor conceded that "TJUH

---

[4] Any remaining references to the phrase "obvious and close nexus" in our Court occurred in unpublished memoranda that were filed prior to May 1, 2019. "Because [] these decisions were filed prior to May 1, 2019, none of them may be cited for their persuasive value. *See* Pa.R.A.P. 126(b) (providing that unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019 may be cited for their persuasive value)." *Commonwealth v. Finnecy*, 249 A.3d 903, 910 n.9 (Pa. 2021).

has an obvious and close nexus to JMC and would be bound by the arbitration provision were it deemed valid and enforceable." ***Id.***

The above summary demonstrates that Pennsylvania courts do not utilize the phrase "obvious and close nexus" to connote some sort of independent doctrine. Instead, our courts have always used the phrase to refer to "common law principles of agency and contract," such as "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." ***See Weiner***, 2001 WL 1807929 at *2 ("[o]ne obvious and close nexus is the relationship created **between a principal and an agent**") (emphasis added); ***Dodds***, 909 A.2d at 351 ("non-signatories to a contract, **such as third-party beneficiaries**, may fall within the scope of an arbitration clause if that is the signing parties' intent") (emphasis added); ***Provenzano***, 121 A.3d at 1097 ("[o]ne 'obvious and close nexus' between the non-signatories and the contract or the contracting parties arises from the relationship **between a signatory principal and a non-signatory agent**") (emphasis added).

Moreover, we have only ever used the phrase in the context of a non-signatory who seeks to **compel arbitration against a signatory**. ***See Weiner***, 2001 WL 1807929 at *2 ("non-signatories to an arbitration agreement **can enforce** such an agreement where there is an obvious and close nexus between the non-signatories and the contract or the contracting parties") (emphasis added); ***Dodds***, 909 A.2d at 351 ("because PHC wishes to **enforce** the arbitration agreement rather than avoid it, [p]laintiffs, as

- 15 -

signatories to the arbitration agreement, should not be able to avoid the requirement to arbitrate by a non-signatory when the non-signatory **wants** to arbitrate") (emphasis in original); ***Provenzano***, 121 A.3d at 1097 ("non-signatories to an arbitration agreement **can enforce** the agreement when there is an 'obvious and close nexus' between the non-signatories and the contract or the contracting parties") (emphasis added); ***Saltzman***, 166 A.3d at 469 n.2 (same).

Within Appellants' brief, Appellants fail to distinguish between non-signatories who seek to compel arbitration with those who seek to avoid arbitration. Thus, Appellants claim that Humphrey and Yu must be compelled to arbitrate their claims simply because Humphrey and Yu are agents of ChinaWhys Co. and ChinaWhys Consulting Co. Appellants' Brief at 29. It is true we have held "that non-signatories to an arbitration agreement can enforce the agreement when there is an 'obvious and close nexus' between the non-signatories and the contract or the contracting parties." To be sure, in ***Provenzano***, we explained:

> Pennsylvania law has held that non-signatories to an arbitration agreement **can enforce** the agreement when there is an "obvious and close nexus" between the non-signatories and the contract or the contracting parties. . . . One "obvious and close nexus" between the non-signatories and the contract or the contracting parties arises from the relationship between a signatory principal and a non-signatory agent; if the principal is bound by an arbitration agreement, its agents, employees and representatives are generally likewise bound and **can enforce** the arbitration agreement, even as non-signatories to the agreement.

***Provenzano***, 121 A.3d at 1097 (citations omitted) (emphasis added).

However, as explained in ***Dodds***, ***Provenzano*** resulted from the fact that the non-signatory "wishe[d] to **enforce** the arbitration agreement rather than avoid it" and, further, from the fact that the "signator[y] to the arbitration agreement[] should not be able to avoid the requirement to arbitrate by a non-signatory when the non-signatory **wants** to arbitrate." ***See Dodds***, 909 A.2d at 352 (emphasis in original). We have never held that the mere relationship of principal and agent, standing alone, may be used to compel the non-signatory agent of a disclosed principal to arbitrate his or her claims. Indeed, this would be contrary to "a basic tenet of agency law" that "an individual acting as an agent for a disclosed [principal] is not personally liable on a contract between the [principal] and a third party unless the agent specifically agrees to assume liability" and the related tenet that "a corporate officer cannot be held personally liable on contracts entered into while acting in his corporate capacity." ***Scungio Borst & Assocs. v. 410 Shurs Lane Developers, LLC***, 146 A.3d 232, 240 (Pa. 2016) (corrections omitted), *quoting* ***Vernon D. Cox & Co. v. Giles***, 406 A.2d 1107, 1110 & n.4 (Pa. Super. 1979); ***see also*** Restatement (Second) of Agency § 320 ("[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract").

In this case, Humphrey signed the Consultancy Agreement on behalf of ChinaWhys Consulting Co. ***See*** Consultancy Agreement, dated April 26, 2013,

- 17 -

at 11 (Humphrey signed the agreement "For ChinaWhys (Shanghai) Consulting Co Ltd"). Yu did not sign the agreement at all. Further, Appellants do not argue – and we do not perceive – anything in the agreement where Humphrey or Yu "specifically agree[d] to assume liability" under the Consultancy Agreement. *Scungio Borst & Assocs.*, 146 A.3d at 240 (quotations and citations omitted). Therefore, under "traditional principles of state law," Humphrey and Yu cannot be compelled to arbitration simply because they are an agent of ChinaWhys Co. or ChinaWhys Consulting Co. *See Arthur Anderson*, 556 U.S. at 630. Appellants' claim to the contrary thus fails.

Next, Appellants claim that plaintiff ChinaWhys Co. must be compelled to arbitrate because ChinaWhys Co. and ChinaWhys Consulting Co. "are affiliated entities, a relationship the trial court described as a 'parent-subsidiary corporate relationship,'" and because plaintiff ChinaWhys Co.'s claims are "inextricably entwined with" the Consultancy Agreement. Appellants' Brief at 26-32. This argument, partially rooted in equitable estoppel, again fails to appreciate the fact that plaintiff ChinaWhys Co., a non-signatory, seeks to **avoid** arbitration, not **enforce** arbitration. As the United States Court of Appeals for the Third Circuit thoroughly explained, this distinction is important:

> appellants rely on a series of cases in which signatories were held to arbitrate related claims against parent companies who were not signatories to the arbitration clause. In each of these cases, a signatory was bound to arbitrate claims brought by a non-signatory because of the close relationship

- 18 -

between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations. In essence, a non-signatory voluntarily pierces its own veil to arbitrate claims against a signatory that are derivative of its corporate-subsidiary's claims against the same signatory. ***Grigson v. Creative Artists Agency, L.L.C.***, 210 F.3d 524, 527 (5th Cir. 2000) (non-signatory able to compel signatory to arbitrate claims related to the contract which contained an arbitration clause); ***Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.***, 10 F.3d 753, 757 (11th Cir. 1993) (compelling signatory to arbitrate claims against non-signatory that were intertwined with claims arising from contract governed by arbitration clause); ***Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.***, 659 F.2d 836, 840–841 (7th Cir. 1981) (same); ***McBro Planning and Dev. Co. v. Triangle Elec. Const. Co., Inc.***, 741 F.2d 342, 344 (11th Cir. 1984) (non-signatory to contract containing arbitration clause was bound by signatory to arbitrate dispute where claims were inextricably intertwined with duties created in underlying contract and non-signatory signed a related contract which contained an arbitration clause). Appellants recognize that these cases bind a **signatory** not a **non-signatory** to arbitration, but argue that this is a distinction without a difference. They are wrong.

Indeed, the Second Circuit recently rejected the same "distinction without a difference" argument:

As these cases indicate, the circuits have been willing to estop a **signatory** from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. As the district court pointed out, however, "[t]he situation here is inverse: E & S, as signatory, seeks to compel Thomson, a non-signatory." While E & S suggests that this is a non-distinction, the nature of arbitration makes it important. Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so. In the line of cases discussed above, the courts held that the parties were estopped from avoiding arbitration because they

- 19 -

had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves. Thomson, however, cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists. At no point did Thomson indicate a willingness to arbitrate with E & S. Therefore, the district court properly determined these estoppel cases to be inapposite and insufficient justification for binding Thomson to an agreement that it never signed.

[**Thomson−CSF, S.A. v. Am. Arbitration Ass'n**, 64 F.3d 773, 779 (2nd Cir.) (internal citations omitted)]. The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged. The District Court recognized that this was so, holding that the corporate form cannot be discarded and a non-signatory required to arbitrate unless its conduct falls within one of the accepted principles of agency or contract law that permit doing so.

**E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S**, 269 F.3d 187, 201-202 (3rd Cir. 2001) (some citations omitted).

We agree with the Third Circuit's analysis and, since Appellants have not claimed or argued that "accepted principles of agency or contract law" compel ChinaWhys Co. to arbitrate under the agreement, Appellants' efforts to compel ChinaWhys Co. to submit to arbitration fail.[5] **See**, **e.g.**, **O'Hanlon v. Uber Techs., Inc.**, 990 F.3d 757, 767 (3rd Cir. 2021) ("equitable estoppel is inapposite where there is no evidence that the nonparties availed themselves

---

[5] Appellants broach, but then abandon, a claim that ChinaWhys Co. and ChinaWhys Consulting Co. are alter egos. **See** Appellants' Brief at 28 n.7.

of the agreement **or received any benefit under that agreement**")
(quotations, citations, and corrections omitted) (emphasis added); **see also**
**Commonwealth v. Miller**, 721 A.2d 1121, 1124 (Pa. Super. 1998) (holding
that this Court may not act as counsel for an appellant and develop arguments
on his or her behalf).

Finally, Appellants claim that Humphrey and Yu have an "obvious and
close nexus" with the Consultancy Agreement because their claims "are based
on or 'inextricably entwined with' [the] contract." Appellants' Brief at 29. As
with Appellants' other claims, this claim fails because Humphrey and Yu seek
to avoid arbitration. Again, the United States Court of Appeals for the Third
Circuit explained:

> equitable estoppel is inapposite where there is no evidence
> that the nonparties availed themselves of the agreement or
> received any benefit under that agreement. . . . This
> standard is distinct from that governing enforcement of an
> arbitration agreement **by** a non-signatory **against** a
> signatory. There, the question is whether "there is an
> obvious and close nexus between the non-signatories and the
> contract or the contracting parties," **Elwyn v. DeLuca**, 48
> A.3d 457, 463 (Pa. Super. 2012), often measured in terms of
> "inextricabl[e] entwine[ment]" of the claims with the
> contract, **id.** We have previously emphasized the importance
> of this distinction and reaffirm it today. **See DuPont**, 269
> F.3d at 202.

**O'Hanlon v. Uber Techs., Inc.**, 990 F.3d 757, 767 & 767 n.6 (3rd Cir. 2021)
(some quotations, citations, and corrections omitted) (emphasis in original).

Appellants do not claim that Humphrey or Yu "received any benefit under" the Consultancy Agreement. As such, Appellants' claim on appeal necessarily fails.[6, 7]

Order affirmed. Jurisdiction relinquished.

Judge Strassburger did not participate in the consideration or decision of this matter.

---

[6] Prior to this case arriving in the Pennsylvania state courts, the parties litigated certain issues in the federal courts. *See Humphrey v. GlaxoSmithKline, PLC*, 2017 WL 4347587 (E.D.Pa. 2017); *Humphrey v. GlaxoSmithKline, PLC*, 905 F.3d 694 (3rd Cir. 2018). During that litigation, Plaintiffs claimed that the federal courts had jurisdiction over the case because they raised federal claims for racketeering and conspiracy related racketeering under 18 U.S.C. § 1962(c) and (d) ("RICO") and because there was diversity between the parties. However, the district court concluded that Plaintiffs did not have standing to assert their RICO claims and that diversity jurisdiction did not exist over Plaintiffs' state law claims. The district court thus dismissed Plaintiffs' complaint and the Third Circuit affirmed.

Within the current appeal, Appellants claim that, during the federal litigation, "[b]oth the Eastern District of Pennsylvania and the Third Circuit expressly held that '[Plaintiffs'] claims are based on the Consultancy Agreement.'" Appellants' Brief at 30 (corrections omitted). Because of this, Appellants claim that "[t]he law-of-the-case doctrine conclusively establishes" the fact that an "obvious and close nexus" exists between Plaintiffs, the dispute, and the contract. *Id.* Again, this argument fails because it does not recognize the distinction between a non-signatory who seeks to enforce an arbitration clause against a signatory and the non-signatory Plaintiffs, who seek to avoid arbitration. *See supra* at **16-21. Further, Appellants' argument fails, as it is not rooted in "common law principles of agency and contract." *Bouriez*, 359 F.3d at 294.

[7] Given our disposition, we do not reach Appellants' claims that the trial court erred when it concluded that there was no "obvious and close nexus" between Appellants and GSK China and that the arbitration clause did not encompass Plaintiffs' claims.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/3/2021