J-E02003-24
J-E02004-24

2024 PA Super 192

| | | |
|---|---|---|
| MICHAEL D. TOTH AND LINAWATI TOTH | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRYAN E. TOTH, EUGENE W. TOTH, MARIE TOTH, AND LEARNING SCIENCES INTERNATIONAL, LLC | : | No. 266 WDA 2022 |
| | : | |
| APPEAL OF: BRYAN E. TOTH, EUGENE W. TOTH, AND MARIE TOTH | : | |

Appeal from the Order Entered February 15, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-21-000372

| | | |
|---|---|---|
| MICHAEL D. TOTH AND LINAWATI TOTH | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRYAN E. TOTH, EUGENE W. TOTH, MARIE TOTH, AND LEARNING SCIENCES INTERNATIONAL, LLC | : | No. 267 WDA 2022 |
| | : | |
| APPEAL OF: BRYAN E. TOTH, EUGENE W. TOTH, AND MARIE TOTH | : | |

Appeal from the Order Entered February 15, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-21-000372

| | | |
|---|---|---|
| MICHAEL D. TOTH AND LINAWATI TOTH | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |

BRYAN E. TOTH, EUGENE W. TOTH, : 
MARIE TOTH, AND LEARNING : No. 403 WDA 2022
SCIENCES INTERNATIONAL, LLC :

APPEAL OF: BRYAN E. TOTH, :
EUGENE W. TOTH, AND MARIE TOTH :

Appeal from the Order Entered April 5, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): G.D. 21-000372

MICHAEL D. TOTH AND LINAWATI : IN THE SUPERIOR COURT OF
TOTH : PENNSYLVANIA
:
:
v. :
:
:
BRYAN E. TOTH, EUGENE W. TOTH, :
MARIE TOTH, AND LEARNING : No. 846 WDA 2022
SCIENCES INTERNATIONAL, LLC :
:
:
APPEAL OF: BRYAN E. TOTH, :
EUGENE W. TOTH, AND MARIE TOTH :

Appeal from the Order Entered July 21, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-21-000372

MICHAEL D. TOTH AND LINAWATI : IN THE SUPERIOR COURT OF
TOTH : PENNSYLVANIA
:
:
v. :
:
:
BRYAN E.TOTH, EUGENE W. TOTH, :
MARIE TOTH, AND LEARNING : No. 514 WDA 2023
SCIENCES INTERNATIONAL, LLC :
:

- 2 -

J-E02003-24
J-E02004-24

                                          :
   APPEAL OF: BRYAN E.TOTH, EUGENE    :
   W. TOTH AND MARIE TOTH             :

         Appeal from the Order Dated April 19, 2023
   In the Court of Common Pleas of Allegheny County Civil Division at
                     No(s):  GD-21-000372


BEFORE:  LAZARUS, P.J., BOWES, J., STABILE, J., DUBOW, J., NICHOLS, J.,
         MURRAY, J., McLAUGHLIN, J., KING, J., and SULLIVAN, J.

OPINION BY NICHOLS, J.:                    **FILED:  August 27, 2024**

     Appellants Bryan E. Toth, Eugene W. Toth, and Marie Toth appeal from

the February 15, 2022 order granting partial summary judgment in favor of

Appellees Michael D. Toth and Linawati Toth (266 WDA 2022); the February

15, 2022 order denying Appellants' motion for summary judgment against

Appellees (267 WDA 2022); the April 5, 2022 order granting Appellees'

petition to dissolve Learning Sciences International, LLC, (LSI) (403 WDA

2022); the July 21, 2022 order appointing a custodian for LSI (846 WDA

2022); and the April 19, 2023 order approving a protective sale and

assignment of assets (514 WDA 2023).[1]  Appellants contend that the trial

_____

[1] The appeals at 266 WDA 2022, 267 WDA 2022, and 403 WDA 2022 were
consolidated *sua sponte* at Superior Court Journal No. J-A06019-23.  **See**
Order, 6/28/22.  The related appeal at 846 WDA 2022 was assigned Superior
Court Journal No. J-A06020-23, and it was consolidated with the appeals at
266 WDA 2022, 267 WDA 2022, and 403 WDA 2022, in an order filed on
August 1, 2022.  After this Court's initial decision was filed at Superior Court
Journal Nos. J-A06019-23 and J-A06020-23, Appellees filed an application for
reconsideration/reargument, and we granted *en banc* reargument in the
appeals at 266 WDA 2022, 267 WDA 2022, 403 WDA 2022, and 846 WDA
2022.  While the appeals at 266 WDA 2022, 267 WDA 2022, 403 WDA 2022,
and 846 WDA 2022 remained pending, the trial court filed an order approving
*(Footnote Continued Next Page)*

court erred in granting summary judgment in favor of Appellees, ordering the dissolution of LSI, appointing a custodian, and approving a protective sale and assignment of assets. After review, we affirm all five orders.

The trial court summarized the relevant facts and procedural history of this matter as follows:

### I. THE PARTIES & BACKGROUND.

Plaintiff Michael Toth ("Michael") is the founder, President, Chief Executive Officer, and owner of 50% voting interest and 25% equity interest of [LSI,] a Pennsylvania educational training LLC operating in and servicing multiple states. Linawati Toth ("Lina"), Michael's wife, is an LSI manager and employee. Bryan Toth ("Bryan"), Michael's brother, owns 50% voting interest and 25% equity interest of LSI. Eugene Toth ("Eugene"), Michael's father, and Marie Toth ("Marie"), Michael's mother, are each 25% owners in equity interest of LSI.

After founding LSI in 2002, Michael gifted Marie, Eugene, and Bryan their respective interests. Around the Thanksgiving holiday in 2020, relations between the parties began to deteriorate. On January 8, 2021, Bryan, Eugene, and Marie met with Florida legal counsel and executed three legal agreements: a "Written Consent to Actions Taken Without a Meeting by the Members of Learning Sciences International, LLC" ("First Written Consent") an "Amended and Restated Operating Agreement of Learning

---

a protective sale and assignment of assets on April 19, 2023. Appellants filed an appeal from that order at Superior Court docket 514 WDA 2023. On February 12, 2024, this Court ordered the appeal at 514 WDA 2023 to be considered *en banc* and listed consecutively to the appeals at 266 WDA 2022, 267 WDA 2022, 403 WDA 2022, and 846 WDA 2022. The appeals at 266 WDA 2022, 267 WDA 2022, 403 WDA 2022, and 846 WDA 2022 were assigned Superior Court Journal No. J-E02003-24, and the appeal at 514 WDA 2023 was assigned Superior Court Journal No. J-E02004-24. Because the appeals at J-E02003-24 and J-E02004-24 are related, we consolidate all of Appellants' appeals at 266 WDA 2022, 267 WDA 2022, 403 WDA 2022, 846 WDA 2022, and 514 WDA 2023 and address them in this opinion.

Sciences International, LLC" ("2021 [Operating] Agreement"), and an additional "Written Consent to Actions Taken Without a Meeting by the Members of Learning Sciences, International, LLC" ("Second Written Consent").

The First Written Consent, signed only by [Appellants], acknowledged that LSI was a Pennsylvania LLC governed by a 2012 Operating Agreement ("2012 [Operating] Agreement") and allegedly allowed [Appellants to] "ratify, approve, and adopt" the 2021 [Operating] Agreement in Michael's absence pursuant to Section 13.5 of the 2012 [Operating] Agreement, which provides that the 2012 [Operating] Agreement "may not be amended except by the written agreement of Members holding Two-Thirds Interest of the Company." By "adopting" the 2021 [Operating] Agreement in light of the First Written Consent, [Appellants] aimed to "approve LSI's change of its headquarters and subject laws to Florida."

The Second Written Consent, signed only by [Appellants], acknowledged Michael and Lina's then-current status as LSI "officers and/or management personnel," yet allegedly allowed [Appellants] to terminate Michael and Lina, having determined that "it was in the best interests of LSI to change some of its current officers and management personnel."

Despite executing the First Written Consent, the 2021 [Operating] Agreement, and the Second Written Consent under the guise of having met the Two-Thirds Interest requirement of Section 13.5 of the 2012 [Operating] Agreement, [Appellants] overlook Section 1.37 of the 2012 [Operating] Agreement which states "Two-thirds Interest shall mean one or more Voting Interests of Members which taken together exceed 66.67% of the aggregate of all Voting Interests." Section 1.39 of the 2012 [Operating] Agreement further provides that Bryan and Michael each have 50% Voting Interest.

## II. PROCEDURAL HISTORY

On December 12, 2021, [Appellees] filed a Complaint seeking injunctive relief and damages against Marie, Eugene, Bryan, and LSI (collectively referred to herein as " Defendants") including the following counts: Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (Count I), Breach of Contract (2012 Operating Agreement) (Count II), Breach of Fiduciary Duty and Common Law Duty of Loyalty (Count III),

- 5 -

Conversion, fraud and Defamation (Count IV, V, & VI), Declaratory Judgment (Count VII), and Constructive Trust and Accounting (Count VIII).

With respect to Count VII, [Appellees] sought judgment declaring that:

(a) The 2012 . . . Operating Agreement remains in full force and Effect, and that the purported Written Consents and 2021 Operating Agreement are null and void and therefore without lawful import, authority or legitimacy;

(b) Mr. Michael Toth remains the President, Chief Executive Officer and employee of LSI, with all of the right, title and privileges of those positions;

(c) Ms. Linawati Toth remains a manager and employee of LSI, with all of the right, title and privileges of these positions;

(d) Defendant LSI is Pennsylvania corporation and must remain so, and any action taken to changes that must be undone as without authorization or legal justification.

In response to [Appellees'] request for injunctive relief, on January 19, 2021, [the trial c]ourt granted [Appellees'] Emergency Motion for Temporary Restraining Order pending resolution of the preliminary injunction, which was scheduled for argument on February 5, 2021. On February 2, 2021, [the trial c]ourt entered an order staying all case activity pending the parties' engagement in alternative dispute resolution [(ADR)] — later deemed to be unsuccessful. While the case was stayed in [the trial c]ourt, [Appellants] brought an additional lawsuit against [Appellees] in Florida state court.

On May 3, 2021, [Appellants'] Preliminary Objections were overruled and [the trial c]ourt ultimately appointed Mr. John McGinley, Jr. as the Interim Custodian Pendente Lite ("[Interim] Custodian") on August 4, 2021.[2] More specifically, [the trial c]ourt tasked the [Interim] Custodian with the purpose of providing interim findings of fact and conclusions of law as to whether the Members were deadlocked in the management of LSI's affairs and whether it would be reasonably practicable for

---

[2] On May 25, 2021, Appellees filed a motion to dissolve and wind-up LSI.

- 6 -

> LSI's Members to carry on the business . . ., as well as other recommendations regarding LSI's management, direction, and ownership. In accordance with the [c]ourt's August 4th order, the [Interim] Custodian filed Interim Finding of Fact and Conclusions of Law ("[Interim] Custodian's Report") on October 22, 2021. Amongst other things, the [Interim] Custodian found that, in light of [Appellants'] failed attempt to adopt the 2021 [Operating] Agreement without Michael's consent, the 2012 Operating Agreement continues to govern LSI and the rights of its Members.
>
> After determining that the dispute as to LSI's governing document was a legal issue capable of resolution via summary judgment, [the trial c]ourt ordered the parties to file cross-motions for summary judgment. On January 12, 2022, [Appellees] filed a Motion for Partial Summary Judgment and [Appellants] filed a Cross-Motion for Summary Judgment, both which are the focus of this appeal. Following argument on the motions, [the trial c]ourt entered two orders — one denying [Appellants'] Cross-Motion for Summary Judgment [(the order at 267 WDA 2022)] and another granting [Appellees'] Motion for Partial Summary Judgment [(the order at 266 WDA 2022)].

Trial Ct. Op., 6/24/22, at 1-5 (some formatting altered and footnotes omitted).

Appellants filed timely and separate notices of appeal from the February 15, 2022 orders. *See* Docket No. 266 WDA 2022 (appeal from the order granting partial summary judgment relief in the form of declaratory judgment in favor of Appellees that the 2012 Operating Agreement controls); Docket No. 267 WDA 2022 (appeal from the order denying Appellants' motion for summary judgment). Both the trial court and Appellants complied with Pa.R.A.P. 1925.

On March 11, 2022 and March 16, 2022, the trial court held hearings on Appellees' motion to dissolve and wind-up LSI. The trial court subsequently entered an order stating:

> AND NOW, this 5th day of April, 2022, having considered [Appellees'] Amended Petition to Dissolve and Wind-Up Learning Sciences International, LLC, [Appellants'] response thereto, and following a hearing thereupon, the court makes the following factual findings and legal conclusions:
>
> A. Michael D. Toth ("Michael"), Bryan E. Toth ("Bryan"), Eugene W. Toth ("Eugene") and Marie Toth ("Marie") are each owners of 25% of the issued and outstanding units of Learning Sciences International, LLC ("LSI").
>
> B. Michael and Bryan each control 50% of the voting rights of LSI.
>
> C. Michael, Bryan, Eugene and Marie are collectively referred to as the "Members." LSI and the Members are parties to [the 2012 Operating Agreement].
>
> D. The Members are and have been engaged in a series of disputes concerning the management, operation and future direction of LSI, which disputes are the subject of litigation with this court in the above captioned case.
>
> E. The Members have been unable to resolve their differences despite efforts to do so at the request of the court through multiple formal mediations and informal settlement discussions.
>
> F. The court has determined that the disputes, divisiveness and litigation among the Members of LSI that currently exist are and will continue to have a lasting and significant adverse consequence upon the viability of LSI to operate as an ongoing concern.
>
> G. LSI is not currently profitable in the current year but for one-time Government assistance, and was barely above break-even for 2020.

H. The court has determined that the Members are irrevocably deadlocked in the management of [LSI's] affairs, and that it is not otherwise reasonably practicable to carry on the business in conformity with LSI's Certificate of Incorporation and Operating Agreement.

I. The Court has determined that [LSI] should begin a process of dissolution under Pennsylvania law applicable to LSI, including, without limitation, the provisions of 15 Pa.C.S. § 8872.

J. The court, having found good cause, hereby exercises its discretion to appoint a liquidating trustee for LSI pursuant to 15 Pa.C.S. § 8872(e) to accomplish such dissolution.

K. The court hereby appoints James Chiafullo, Esq., of Dentons, Cohen & Grisby (the "Liquidating Trustee") to serve as Liquidating Trustee of LSI, with all power, authority, protection and duty of a Liquidating Trustee appointed under . . . 15 Pa.C.S. § 8872(e) for the purpose, *inter alia*, of consummating such dissolution, and to carry out such dissolution with all possible deliberation and speed.

Trial Court Order, 4/5/22, at 1-2. Appellants filed a timely appeal from the trial court's order, which was docketed at 403 WDA 2022. Appellants moved for a stay pending appeal, and this Court granted the motion for stay on June 16, 2022.

Thereafter, the trial court explained:

During the pendency of the appeal, Michael Toth initially continued to manage the company as CEO. However, the uncertainty surrounding this litigation and the future existence of LSI have created roadblocks to maintaining business as usual. Employees, some of whom are key personnel, have been leaving LSI and it has become understandably difficult to recruit and retain new employees. Due to LSI's primary clients being school districts, its contracts typically begin in August and last for the entire school year. The uncertainty and low retention of employees has made

- 9 -

it impossible to anticipate whether LSI is able to enter into and perform new contracts for the school year or whether such contracts would create greater liability for the company. As such, LSI formed no new contracts and currently has no new income. The litigation and deadlock has gone so far as to cause hesitancy among LSI's existing clients about its ability to perform. Also contributing to this *de facto* slowing down and winding up of LSI is Michael's stepping down as CEO. Despite the stay of [the trial c]ourt's dissolution order, Michael has allegedly taken steps to form a new company in anticipation of LSI's eventual dissolution, such as creating a website and hiring former LSI employees.

As a result of these developments, on June 28, 2022[, Appellees] sought temporary relief from the Superior Court's stay order so as to petition [the trial c]ourt to appoint a receiver to manage the company's remaining affairs and pay its debts as they come due pending the resolution of [Appellants'] appeal. By order dated June 29, 2022, the Superior Court granted the relief and temporarily lifted the stay order for the limited purpose of having [the trial c]ourt rule on [Appellees'] petition to appoint a receiver. On July 15, 2022[, the trial c]ourt heard argument on the petition to appoint the receiver. Despite the numerous allegations of Michael's apparent conflict of interest in running LSI and winding up its affairs, [Appellants] astonishingly opposed the appointment of an impartial receiver to run the company. By order dated July 21, 2022, [the trial c]ourt granted the petition and appointed a receiver.

Trial Ct. Op., 9/2/22, at 1-2. Appellants subsequently filed a timely appeal from the July 21, 2022 order appointing the custodian, which was docketed at 846 WDA 2022.

While the appeals at 266 WDA 2022, 267 WDA 2022, 403 WDA 2022, and 846 WDA 2022 remained pending, on April 19, 2023, the trial court approved the custodian's recommendation for a protective sale and assignment of assets. Appellants filed an appeal from that order, which was docketed at 514 WDA 2023. In sum, the instant matter involves five

separate docket numbers: 266 WDA 2022, 267 WDA 2022, 403 WDA 2022, 846 WDA 2022, and 514 WDA 2023. Appellants and the trial court have complied with Pa.R.A.P. 1925 in all five matters.

In these consolidated and related appeals, Appellants raise the following issues:

1. [Appeals at 266 WDA 2022 and 267 WDA 2022:] Whether the trial court committed reversible error by granting, on a motion for summary judgment, a declaratory judgment in [Appellees'] favor insofar as: (1) as a matter of law, [Appellants] were entitled to judgment in their favor on [Appellees'] declaratory judgment claim; and (ii) alternatively, at a minimum, genuine issues of material fact remained as to [Appellees'] declaratory judgment claim and [Appellants'] defenses thereto?

2. [Appeal at 403 WDA 2022:] Whether the trial court committed reversible error by ordering the dissolution of LSI, insofar as: (i) the decision was inextricably linked to the trial court's erroneous declaratory judgment; and (ii) alternatively, even if the declaratory judgment was proper, myriad other independent factual and legal deficiencies precluded the trial court's order as a matter of law?

3. [Appeal at 846 WDA 2022:] Whether the trial court committed reversible error by appointing James Chiafullo as custodian of LSI insofar as: (i) the decision was directly at odds with this Court's Orders staying the Plan of Dissolution ordered previously by the trial court; and (ii) independent of this Court's Stay Order, the factual and legal predicates for said appointment were unsatisfied as a matter of law?

Appellants' Brief at 6-7. Further, in the most recent and related appeal at 514 WDA 2023, Appellants raise the following issue:

Whether the trial court committed reversible error by approving the Custodian's actions, on behalf of LSI, to sell and license LSI's valuable intellectual property and certain other assets to Michael Toth and his new company where: (1) such transactions exceeded

his legal authority as a custodian; (2) such transactions violated this Court's Stay Order; (3) the transactions reflected a poor value proposition for LSI; and (4) the transactions constituted unlawful self-dealing by Michael Toth, to his own benefit and to the detriment of LSI and his co-owners?

Appellants' Brief at 514 WDA 2023, at 5.[3]

### **Appealability of Orders - 266 WDA 2022 & 267 WDA 2022**

As an initial matter, we first address whether the appeals at 266 WDA 2022 and 267 WDA 2022 are properly before this Court. It is well settled that

the appealability of an order directly implicates the jurisdiction of the court asked to review the order. ***Knopick v. Boyle***, 189 A.3d 432, 436 (Pa. Super. 2018) (internal citation omitted). As a general rule, appellate courts have jurisdiction only over appeals taken from a final order. ***In re Bridgeport Fire Litigation***, 51 A.3d 224, 229 (Pa. Super. 2012). A final order is one that disposes of all the parties and all the claims; or is entered as a final order pursuant to the trial court's determination under Rule 341(c). Pa.R.A.P. 341(b)(1), (3). An appeal may also be taken from an order that is made final or appealable by statute or general rule, even though the order does not dispose of all claims and of all parties. Pa.R.A.P. 311(a)(8).

***Schmitt v. State Farm Mutual Auto. Ins. Co.***, 245 A.3d 678, 681 (Pa. Super. 2021) (quotation marks omitted).

Additionally, 42 Pa.C.S. § 7532 provides:

Courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory

---

[3] For clarity, we refer to Appellants' Brief at 266 WDA 2022, 267 WDA 2022, 403 WDA 2022, and 846 WDA 2022 as "Appellants' Brief," and we shall refer to the brief in the most recent appeal at 514 WDA 2023 as "Appellants' Brief at 514 WDA 2023."

- 12 -

judgment or decree is prayed for.  The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree.

42 Pa.C.S. § 7532.

"Although the [Declaratory Judgments] Act provides that the declaration shall have the 'force and effect of a final judgment or decree,' . . . .  It is the nature of the order at issue that dictates whether it is final and appealable." **Schmitt**, 245 A.3d at 682 (citation omitted).  This Court has summarized the case law regarding declaratory judgment actions that do not dispose of all claims and all parties as follows:

> In **Bolmgren v. State Farm Fire and Cas. Co.**, 758 A.2d 689 (Pa. Super. 2000), the appellee brought an action against State Farm for a declaration of coverage under a homeowner's policy and for damages.  Specifically, Counts I-III of the appellee's amended complaint sought relief in the form of declaratory judgment, and Count IV sought damages, attorney's fees, interest and costs.  Following competing motions for summary judgment, the court granted summary judgment in favor of the appellee on Counts I-III.  State Farm appealed.  As a prefatory matter, this Court considered whether the appeal was properly before us, where the damages claim in Count IV of the amended complaint remained outstanding.
>
> In addressing whether the appeal was proper under Rule 311(a)(8) by way of the Declaratory Judgments Act, this Court explained:
>
>> Although the Act provides that the declaration shall have the "force and effect of a final judgment or decree," this partial adjudication does not become appealable merely because it is cast in the form of a declaratory judgment.  Appellee's complaint in this matter, although captioned a declaratory judgment, sought ordinary civil relief and remedies in the form of a declaration of coverage and damages.[FN1]  Her request for further relief, in the form of damages, has yet to

- 13 -

be determined.  Because an appeal will not lie from an interlocutory order, the present appeal must be quashed.

> [FN1] It is the nature of the order at issue that dictates whether it is final and appealable.  In this case, the order is not final since it does not dispose of the claim of damages raised in the complaint, in addition to the request for declaratory judgment.  This case is different than that in **Redevelopment Authority of Cambria County v. International Insurance Co.**, [685 A.2d 581 (Pa. Super. 1996), *appeal denied*, 695 A.2d 787 (Pa. 1997)].  In that case the complaint sought relief in the form of declaratory judgment that Erie [Insurance Group] and International [Insurance Co.] owed a duty to defend and to indemnify the Authority in an action filed by a third party.  In that case, the order was final because the trial court's determination that Erie [Insurance Group] had a duty to defend the third-party claim effectively ended the litigation.  Here, in addition to the declaration of rights, the trial [c]ourt was asked to award damages under the policy.  Under these circumstances, the [trial] court is required to address this request.  Without doing so, the order is not final.

*Id.* at 691. . . .

This Court has repeatedly applied **Bolmgren** when discussing the appealability of orders that resolve declaratory judgment claims but leave other claims outstanding.  *See, e.g., Bombar v. West American Ins. Co.*, 932 A.2d 78, 85-86 (Pa. Super. 2007) (holding that trial court's initial January 19, 2005 order granting summary judgment on declaratory judgment count of complaint was not final and appealable, where that order did not determine amount of damages for remaining bad faith claim; appeal from later December 30, 2005 order resolving outstanding bad faith claim was proper); *Cresswell v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 820 A.2d 172, 176 n.2 (Pa. Super. 2003) (determining trial court's initial December 20, 2001 order granting partial summary judgment in favor of appellee on declaratory judgment claim was interlocutory and unappealable, where court's order left unresolved additional bad faith claim; trial court's later order of May 28, 2002, which disposed of sole remaining bad faith claim, was final and appealable); *Moore Motors, Inc. v. Beaudry*, 775

- 14 -

A.2d 869, 870 (Pa. Super. 2001) (*per curiam*) (quashing appeal from order granting appellees' motion for partial summary judgment as interlocutory and unappealable; although court granted summary judgment in favor of appellees on all nine counts of appellants' amended complaints, and on count I of appellees' counterclaim seeking declaratory judgment, court's order left unresolved counts II and III of appellees' counterclaim; holding "absent an express determination of finality under Rule 341(c), the dismissal of a complaint with the concomitant dismissal of only one count of a multi-count counterclaim is interlocutory and unappealable. . . . To hold otherwise would permit the kind of piecemeal litigation that the Supreme Court specifically tried to eliminate when it enacted Rule 341").

Simultaneous to this Court's continued application of **Bolmgren**, our Supreme Court has issued a line of cases also dealing with the appealability of orders resolving declaratory judgment claims, beginning with **Nationwide Mut. Ins. Co. v. Wickett**, 763 A.2d 813 (Pa. 2000). In **Wickett**, our Supreme Court explained that under Section 7532, "an order in a declaratory judgment action that either affirmatively or negatively declares the rights and duties of the parties constitutes a final order." **Id.**, 763 A.2d at 818. Consequently, the Court held that an order sustaining the preliminary objections in the nature of a demurrer of some defendants in a declaratory judgment action, and dismissing those defendants from the case, was a final, appealable order, even though claims against other defendants remained outstanding.

In **Pennsylvania Bankers Ass'n v. Pennsylvania Dep't of Banking**, 948 A.2d 790 (Pa. 2008), the Court limited the breadth of **Wickett**. In that case, certain banks filed a complaint against the Pennsylvania Department of Banking asserting different theories for declaratory relief, including several constitutional claims. The Commonwealth Court, which had original jurisdiction in the case, sustained the Department of Banking's preliminary objections in the nature of a demurrer regarding some of the banks' claims. Our Supreme Court quashed the appeal as interlocutory, distinguishing **Wickett** as follows:

> The Banks . . . argue that the Commonwealth Court's order constitutes a final, appealable order pursuant to **Wickett**. We find **Wickett** distinguishable, however, for the following reasons. In **Wickett**, the trial court's order put certain defendants out of court by dismissing all of the plaintiff's

claims against them. In so doing, the order prevented the plaintiffs from obtaining any relief against these parties. It would therefore be appropriate in this context to characterize the trial court's order as a final order under 42 Pa.C.S. § 7532 because it, in essence, declared that the plaintiffs did not have any viable theory of recovery against such defendants.

In contrast . . . , the Commonwealth Court's order in this case did not dismiss any party, but merely narrowed the scope of the Banks' declaratory judgment action, which raised alternative theories of relief. Because the Banks might still obtain the relief they are seeking based on one of the remaining constitutional theories, the Commonwealth Court's order sustaining the [Department of Banking's] preliminary objections has no certain effect upon the ultimate relief to which the Banks may be entitled. Thus, we find that the Commonwealth Court's order in this case did not declare the parties' rights within the meaning of 42 Pa.C.S. § 7532, and therefore, it is not a final order under **Wickett**.[FN16]

> [FN16] Notably, the intermediate appellate courts have limited **Wickett** to contexts where at least one party has been dismissed from the case. **See Wimer v. Pa. Employees Benefit Trust Fund**, 868 A.2d 8, 13 (Pa. Super. 2005), *aff'd*, 939 A.2d 843 (Pa. 2007) (finding **Wickett** applies when a complaint is dismissed and the plaintiffs are put out of courts); **Consolidation Coal Co. v. White**, 875 A.2d 318, 325 (Pa. Super. 2005) (holding an order is only final under **Wickett** when there is "no conceivable legal theory under which Appellants could prevail"); **Creswell**, [820 A.2d at 176 n.2] (granting partial summary judgment was not a final order under **Wickett** because one claim remained); **Independ. Oil & Gas Ass'n of Pa. v. Pa. Pub. Util. Comm'n**, 804 A.2d 693, 701 (Pa. Cmwlth. 2002) (determining that **Wickett** does not apply unless the plaintiffs are put out of court).

*    *    *

For the reasons outlined above, we conclude that the Commonwealth Court's order in this case, which sustained the [Department of Banking's] preliminary objections in the

nature of a demurrer with respect to some, but not all, of the Banks' constitutional claims, is not a final, appealable order. Our conclusion today is not only informed by our well-established policy of avoiding piecemeal litigation, it also recognizes that such an order does not represent an affirmative or negative declaration of the parties' rights within the meaning of 42 Pa.C.S. § 7532 because alternate avenues of relief can still be pursued against the same parties in the courts below.

Accordingly, we quash the instant appeal as interlocutory.

***Pennsylvania Bankers Ass'n***, 948 A.2d at 799-800 (some internal footnotes omitted). ***See also United States Organizations for Bankruptcy Alternatives, Inv. v. Department of Banking ("USOBA")***, 26 A.3d 474 (Pa. 2011) (quashing appeal from Commonwealth Court's order striking two provisions of Debt Management Services Act ("Act 117") as unconstitutional; Commonwealth Court did not address several of USOBA's arguments and did not ultimately decide whether USOBA was entitled to full relief originally requested, which remains available via USOBA's alternate arguments; essentially, Commonwealth Court simply narrowed scope of USOBA's declaratory judgment action, without ultimately deciding case; Department of Banking appealed order which, in light of USOBA's original challenge to Act 117, granted USOBA only partial declaration of parties' rights, status, or legal relations).

Most recently in the ***Wickett*** line of cases, our Supreme Court summarized these holdings in ***Pennsylvania Manufacturers' Assoc. Ins. Co. v. Johnson Matthey, Inc.***, 188 A.3d 396 (Pa. 2018), stating:

This Court last expounded upon the appealability of an order declaring the rights of parties in [***USOBA***]. In that decision, the Court provided a rather straightforward two-part test for appellate courts to apply when considering whether an order declaring the rights of parties is final and appealable: (1) what is the effect of the lower court's decision on the scope of the litigation; and (2) what practical effect does the court's decision have on the ultimate outcome of the case. . . . If the order in question merely narrows the scope of the litigation and does not resolve the entirety of the parties' eligibility for declaratory relief, then the order is interlocutory and not immediately appealable.

> *Pennsylvania Manufacturers'*, 188 A.3d at 399-400 (quashing appeal as interlocutory where Commonwealth Court entered order that effectively denied appellant's claim for declaratory relief but left unresolved appellee's related but broader counterclaim for declaratory relief; as order on appeal does not resolve parties' competing claims for declaratory relief but merely narrowed dispute, order is not appealable at this time). *See also Titeflex Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 88 A.3d 970 (Pa. Super. 2014) (holding order declaring that appellant-insurer had duty to defend appellee-corporation in underlying actions was appealable because order resolved declaratory judgment action for all practical purposes; only conclusion left for trial court to reach was amount of indemnification, which could not be made until underlying actions were completed; once trial court determined that insurer had duty to defend, underlying actions could continue; thus, this case is analogous to *Redevelopment Authority*, and not subject to limitation on *Wickett* announced in *Pennsylvania Bankers Ass'n*).

*Schmitt*, 245 A.3d at 682-85 (some formatting altered).

In sum, applying the two-part test from *Pennsylvania Manufacturers'* requires this Court to determine (1) the effect of the trial court's decision on the scope of the litigation; and (2) the practical effect the trial court's decision has on the outcome of the case. *Pennsylvania Manufacturers'*, 188 A.3d at 400. As noted, if an order "merely narrows the scope of the litigation and does not resolve the entirety of the parties' eligibility for declaratory relief, then the order is interlocutory and not immediately appealable." *Id.* (citation omitted).

In the instant case, Appellants appealed from the trial court's February 15, 2022 orders granting declaratory judgment in favor of Appellees at 266 WDA 2022 and denying Appellants' cross-motion for summary judgment at

267 WDA 2022. In its June 24, 2022 opinion, the trial court concluded that neither order was appealable. *See* Trial Ct. Op., 6/24/22, at 9.

On March 23, 2022, this Court issued a rule directing Appellants to show cause why the appeals at 266 WDA 2022 and 267 WDA 2022 should not be quashed as interlocutory. *See* Superior Court Order, 3/23/22. Appellants filed a response asserting that the February 15, 2022 orders are appealable pursuant to Rule 311(a)(8), and asserting that *Schmitt* is distinguishable. Resp. to Rule, 4/1/22, at 1-2. On June 28, 2022, this Court discharged the rule to show cause and informed the parties that the issue would be decided by the merits panel. Superior Court Order, 6/28/22.

As noted previously, with respect to the appeal at 266 WDA 2022, Appellees sought partial summary judgment in the form of declaratory relief concerning which operating agreement was LSI's governing document and whether Michael Toth would continue to remain president and CEO of LSI. *See* Trial Ct. Op., 6/24/22, at 4; Appellees' Mot. for Partial Sum. Jud., 1/12/22, at 3, 14.

> In granting Appellees' motion, the trial court issued an order stating:
>
> AND NOW, to wit, this 15th day of February, 2022, upon due consideration of [Appellees'] Motion for Partial Summary Judgment, all filings relevant thereto, and after hearing oral argument on the same, it is hereby ORDERED, ADJUDGED, and DECREED that said motion is GRANTED. Accordingly, the Court enters a declaratory judgment as follows:
>
> (1) The 2012 [Operating Agreement for LSI] remains in full force and effect; and

- 19 -

> (2) The purported 2021 [Operating Agreement for LSI] was, from its inception, null and void, without lawful import, authority, or legitimacy.

Trial Court Order on Appeal at 266 WDA 2022, 2/15/22.

Following our review, we conclude that the trial court's order at 266 WDA 2022 meets the two-part test for an appealable order. **See Pennsylvania Manufacturers'**, 188 A.3d at 400. We recognize that the trial court's order did not address whether Michael Toth should continue as LSI's president. However, because the trial court found that the 2012 Operating Agreement was controlling, the order effectively resolved Appellees' declaratory judgment claims for all practical purposes. Therefore, the trial court's interlocutory order was appealable as of right. **See id.**; **see also Titeflex Corp.**, 88 A.3d at 976; Pa.R.A.P. 311(a)(8); 42 Pa.C.S. § 7532. Accordingly, we are constrained to disagree with the trial court's conclusion that the appeal at 266 WDA 2022 should be quashed.

With respect to the order on appeal at 267 WDA 2022, Appellants filed a cross-motion for summary judgment requesting that the trial court dismiss Appellees' petition to dissolve and wind-up LSI and asking the court to make a determination that the 2021 Operating Agreement should control. **See** Appellants' Cross-Mot. for Sum. Jud., 1/12/22, at 12-44, 45. Unlike Appellees, Appellants did not request summary judgment in the form of declaratory relief. In denying Appellants' motion, the trial court issued an order stating:

> AND NOW, to wit, this 15th day of February, 2022, upon due consideration of [Appellants'] Cross-Motion for Summary

Judgment, all filings relevant thereto, and after hearing oral argument on the same, it is hereby ORDERED, ADJUDGED, and DECREED that said motion is DENIED.

Trial Court Order on Appeal at 267 WDA 2022, 2/15/22.

We recognize that the trial court's order at 267 WDA 2022 did not explicitly resolve Appellants' dispute concerning Appellees' motion to involuntarily dissolve LSI and that Appellants did not seek declaratory relief. However, because the trial court denied Appellants' motion in its entirety, the order had the practical effect of denying declaratory relief concerning the 2021 Operating Agreement and the dissolution of LSI, *see, e.g., Coticchia v. Malcovery Security, LLC*, 143 WDA 2021, 2021 WL 5827318, at *4 (Pa. Super. 2021) (unpublished mem.),[4] both of which were critical issues at the center of this litigation and the outcome of this case. *See Pennsylvania Manufacturers'*, 188 A.3d at 400; *Schmitt*, 245 A.3d at 683; *Titeflex Corp.*, 88 A.3d at 976. Therefore, we conclude that the trial court's order had the effect of doing more than narrowing the scope of the litigation. *See Pennsylvania Manufacturers'*, 188 A.3d at 400; *Schmitt*, 245 A.3d at 683; *Titeflex Corp.*, 88 A.3d at 976.

For these reasons, we conclude that the order denying Appellants' cross-motion for summary judgment at 267 WDA 2022 is an interlocutory

---

[4] *See* Pa.R.A.P. 126(b) (non-precedential Superior Court decisions filed after May 1, 2019, may be cited for their persuasive value).

- 21 -

appealable order as of right pursuant to Pa.R.A.P. 311(a)(8).[5]  Accordingly, we are constrained to disagree with the trial court's conclusion that the appeal at 267 WDA 2022 should be quashed.  ***See Pennsylvania Manufacturers'***, 188 A.3d at 400; ***see also Titeflex Corp.***, 88 A.3d at 976; Pa.R.A.P. 311(a)(8); 42 Pa.C.S. § 7532.

In sum, because we conclude that the appeals at both 266 WDA 2022 and 267 WDA 2022 are properly before this Court, we will address the merits of Appellants' claims.

### Appeal at 266 WDA 2022

On the merits, Appellants contend that the trial court erred in concluding that the 2012 Operating Agreement controlled and that the 2021 Operating Agreement was a nullity.  Specifically, Appellants argue that the 2012 Operating Agreement's provision regarding voting rights permitted Appellants to amend LSI's governing documents, and therefore the 2021 Operating Agreement is valid.  Appellants' Brief at 31-37.  Alternatively, Appellants claim that the language concerning voting rights in the 2012 Operating Agreement is ambiguous and subject to different but reasonable interpretations, and

---

[5] We note that the order on appeal at 403 WDA 2022, which ordered the dissolution of LSI, the order on appeal at 846 WDA 2022, which appointed a custodian, and the appeal at 514 WDA 2023, which approved a protective sale and assignment of assets, all affect the possession or control of property. Therefore, these orders are interlocutory appeals as of right.  ***See*** Pa.R.A.P. 311(a)(2).

therefore presents a genuine issue of fact, accordingly summary judgment was entered in error. *See id.* at 38-39.

When reviewing a trial court's decision granting or denying a motion for summary judgment, we adhere to the following standard and scope of review:

> We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016); *see also Jones v. Unitrin Auto and Home Ins. Co.*, 40 A.3d 125, 127 (Pa. Super. 2012) (noting that "ordinary summary judgment procedures are applicable to declaratory judgment actions").

This Court has explained that where an agreement contains definitions for the words contained therein, the court will apply those definitions in interpreting the agreement. *See Monti v. Rockwood Ins. Co.*, 450 A.2d 24, 25 (Pa. Super. 1982). Moreover,

> [i]f the contractual terms are clear and unambiguous on their face, then such terms are deemed to be the best reflection of the intent of the parties. If, however, the contractual terms are ambiguous, then resort to extrinsic evidence to ascertain their meaning is proper. A contract's terms are considered ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.

- 23 -

***Commonwealth ex rel. Kane v. UPMC***, 129 A.3d 441, 463 (Pa. 2015)

(formatting altered and citations omitted). Further,

> our review is guided by certain principles, or canons, of contract interpretation. . . . First, the entire contract should be read as a whole . . . to give effect to its true purpose. Second, a contract must be interpreted to give effect to all of its provisions. Thus, our Court will not interpret one provision of a contract in a manner which results in another portion being annulled. Third, a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons, such as thwarting the intent of the agreement. And, finally, a party's performance under the terms of a contract is evidence of the meaning of those terms.

***Id.*** at 463-64 (formatting altered and citations omitted).

Finally, when reviewing an LLC's operating agreement, we note that "[a]n operating agreement may specify that its amendment requires the approval of a person that is not a party to the agreement or the satisfaction of a condition. An amendment is ineffective if its adoption does not include the required approval or satisfy the specified condition." 15 Pa.C.S. § 8817(a) (citations omitted).

Instantly, in Appellants' appeal at 266 WDA 2022, they argue that the language from the 2012 Operating Agreement permitted Appellants to amend the agreement and create the 2021 Operating Agreement. Appellants assert that "Section 13.5 of the 2012 Operating Agreement provided that the agreement 'may not be amended except by the written agreement of Members holding Two-Thirds Interest of the Company.'" Appellants' Brief at 32 (quoting

2012 Operating Agreement at Section 13.5).  Appellants claim that the 2012

Operating Agreement establishes the following:

> • Section 1.22: Membership Interest means "A Member[']s entire interest in the Company, including such Member's Economic Interest and such other rights and privileges that the Member may enjoy . . . ."
>
> • Section 1.24: Ownership Interest means: "in the case of a Member, the Member's Membership Interest . . . ."
>
> • Section 1.39: Voting Interests are held by Michael Toth and Bryan Toth, each said interest carrying 50% weight, *i.e.*, each individual holds an equal Voting Interest.
>
> • Section 1.37: Two-Thirds Interest means: "one or more Voting Interests of Members which taken together exceed 66.67% of the aggregate of all Voting Interests."
>
> • Section 1.20: Majority Interest means "one or more Voting Interests of Members which taken together exceed fifty percent (50%) of the aggregate of all Voting Interests."

Appellants' Brief at 32 (formatting altered and citations omitted).

Appellants claim that this language supports the conclusion that Appellants were members holding a combined interest in 75% of LSI, and therefore, Appellants' total votes constituted more than 66.67% allowing Appellants to vote to amend the 2012 Operating Agreement.  Appellants' Brief at 32-35.  Appellants assert that "it was absolutely the parties' intent that a decision as fundamental as amending the [2012 O]perating [A]greement would be reserved for all of the company's owners."  Appellants' Brief at 34 (emphasis omitted).

Appellants allege that the language from Section 13.5, which sets forth the requirements to amend the 2012 Operating Agreement, states that the agreement "may not be amended except by the written agreement of Members holding Two-Thirds Interest of the Company[.]" *Id.* at 37. Appellants assert that the inclusion of the words "of the company" modifies and expands the definition of "Two-Thirds Interest" from Sections 1.37 and 1.39, and it allows for the conclusion that "Voting Interest" includes Eugene and Marie, in addition to Bryan and Michael. *Id.* at 33-38; Appellants' Reply Brief at 5-6.

In resolving Appellants' claims, the trial court concluded that (1) Appellants did not satisfy the voting requirements necessary to amend the 2012 Operating Agreement; and (2) the terms of the 2012 Operating Agreement were unambiguous. *See* Trial Ct. Op., 6/24/22, at 11-12.

As noted previously, Section 13.5 of the 2012 Operating Agreement states: "This Agreement may not be amended except by the written agreement of Members holding Two-Thirds Interest of the Company." 2012 Operating Agreement at Section 13.5. The 2012 Operating Agreement defines a "Two-Thirds Interest" as follows: "Two-thirds Interest shall mean one or more Voting Interests of Members which taken together exceed 66.67% of the aggregate of all Voting Interests." *Id.* at Section 1.37. The 2012 Operating Agreement specifically and exclusively limited "Voting Interest" to Bryan and Michael. *See id.* at 1.39. Indeed, Michael has 50% Voting Interest,

and Bryan has 50% Voting Interest. *See id.* Further, Section 1.39 expressly states that Eugene and Marie have "0%" Voting Interest. *Id.* at Section 1.39.

Accordingly, Appellants' voting rights claims are belied by the record and are meritless. Although the 2012 Operating Agreement provides that Bryan, Eugene, and Marie each have a 25% sharing ratio pursuant to Section 1.33, the 2012 Operating Agreement does not provide Eugene nor Marie with voting interests. The 2012 Operating Agreement unambiguously and expressly states that only Bryan and Michael have voting interests to amend the 2012 Operating Agreement. *See id.* at Sections 1.20, 1.37, 1.39, and 13.5. Contrary to Appellants' assertions, there is no support in the record for their claim that Bryan, Eugene, and Marie's aggregate 75% economic interest and sharing ratio pursuant to Sections 1.14, 1.15, 1.17,[6] and 1.33, could be combined to satisfy the "Two-Thirds Interest" required to amend the 2012 Operating Agreement. On this record it is clear that the 2012 Operating Agreement does not provide voting interests to Eugene and Marie such that they cannot parlay their economic interests into voting interests. *See id.* at Section 1.39. In sum, we agree with the trial court that Appellants have not

---

[6] Pursuant to Sections 1.14, 1.15, and 1.17, Eugene and Marie have limited interests in LSI, and they are Equity Owners with an Economic Interest. *See* 2012 Operating Agreement at Sections 1.14, 1.15, and 1.17. The Agreement specifies that Equity Owners and Economic Interest Owners are not "Members" such as Bryan and Michael, and expressly lack "the right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members or Officers." 2012 Operating Agreement at Section 1.14; *see also id.* at Sections 1.15, 1.17, and 1.33.

satisfied the voting requirements necessary to amend the 2012 Operating Agreement. *See* Trial Ct. Op., 6/24/22, at 11-12.

Further, we agree with the trial court that the terms of the 2012 Operating Agreement are unambiguous. The trial court explained as follows:

[Appellants] also go on to assert that, in the alternative, [the trial c]ourt erred in entering a declaratory judgment in [Appellees'] favor on a motion for summary [judgment and alleged] the existence of ambiguous language in Section 13.5 of the [2012 Operating Agreement] and the existence of a genuine issue of material fact concerning what the parties' intended under [Section] 13.5 of the 2012 [Operating] Agreement.

When construing agreements involving clear and unambiguous terms, courts need only examine the writing itself to give effect to the parties' understanding. ***Stephan v. Waldron Elec. Heating & Cooling LLC***, 100 A.3d 660, 665 (Pa. Super. 2014) ("This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.")[.] As discussed above, [Section] 13.5 of the 2012 [Operating] Agreement was not ambiguous. In examining [Section] 13.5 of the Agreement, requiring "Two-Thirds Interest" for a valid amendment with [Section] 1.37, defining Two-Thirds Interest to be the excess of 66.67% of all Voting Interest, defined as the interests belonging only to Michael and Bryan in equal share in [Section] 1.[3]9, the parties' understanding is clear under the 2012 [Operating] Agreement's plain meaning as written. ***See Stephan***, 100 A.3d at 665. Thus, given the absence of any genuine issue of material fact, [the trial c]ourt properly entered a declaratory judgment on [Appellees'] . . . Motion for Partial Summary Judgment.

Trial Ct. Op., 6/24/22, at 12 (some formatting altered and footnote omitted).

On this record, we agree with the trial court and conclude that there is no ambiguity in the language of the 2012 Operating Agreement. The trial court concluded that "Voting Interest" was defined in the 2012 Operating

Agreement and unambiguously reflected that the only voting interests were held by Bryan and Michael, each holding a 50% interest. As such, the 2012 Operating Agreement unambiguously precluded the 2021 Operating Agreement, and the trial court correctly concluded that the 2012 Operating Agreement is LSI's governing document.

For these reasons, Appellants lacked sufficient voting interests to amend the 2012 Operating Agreement. Because Appellants lacked the votes to amend the 2012 Operating Agreement, we agree with the trial court that the 2021 Operating Agreement is a legal nullity. Accordingly, we discern no error in the trial court entering partial summary judgment on this issue in favor of Appellees, finding that the 2021 Operating Agreement was a nullity, and concluding that the 2012 Operating Agreement remained in force. On this record, we affirm the order on appeal at 266 WDA 2022 and no relief is due.

## Appeal at 267 WDA 2022

Appellants next argue that the trial court erred in denying their cross-motion for summary judgment and concluding that the 2012 Operating Agreement controlled and that the 2021 Operating Agreement was a nullity. Appellants' Brief at 31-39.

In addressing Appellants' claim, the trial court explained:

Although [Appellants] argue that this court erred by failing to grant . . . summary judgment in [Appellants'] favor, asserting that this court was required to determine, as a matter of law, that the 2021 Agreement was lawfully adopted, displaced the 2012 Agreement, and now governs LSI's affairs — this court disagrees.

- 29 -

\*     \*     \*

With respect to the 2012 Agreement, Article 13.5 provides in pertinent part that the agreement may not be amended except by the written agreement of Members holding two-thirds interest of the Company. Two-thirds interest is defined as one or more voting interests of Members which taken together exceed 66.67% of the aggregate of all voting interests. Voting interest is further defined as those interests belonging only to Michael and [Appellant] Bryan Toth in equal share (50% each) under Art. 1.19. Although Article 1.19 makes clear that Eugene and Marie have 0% voting interest, [Appellants'] assertion that their collective 75% economic interest as members meets the requirements of Article 13.5 to allow for amendment in the absence of Michael flies in the face of the only reasonable interpretation of the 2012 Agreement. Seeing that there was certainly evidence to allow a factfinder to render a verdict in favor of [Appellees], this court did not err by [denying Appellants' motion for summary judgment].

*See* Trial Ct. Op., 6/24/22, at 10-11 (formatting altered and internal citations and footnotes omitted).

Following our review, we agree with the trial court that "Voting Interest" was defined in the 2012 Operating Agreement and unambiguously reflected that the only voting interests were held by Bryan and Michael, each holding a 50% interest. *See id.* at 10-12. The 2012 Operating Agreement unambiguously precluded the 2021 Operating Agreement, and the trial court correctly concluded that the 2012 Operating Agreement is LSI's governing document. *See Kane*, 129 A.3d at 463. Therefore, Appellants lacked sufficient voting interests to amend the 2012 Operating Agreement, and the 2012 Operating Agreement remains in control. On this record, we discern no error in the trial court's order denying Appellants' motion for summary judgment, and we affirm the order on appeal at 267 WDA 2022.

- 30 -

**Appeal at 403 WDA 2022**

In the appeal at 403 WDA 2022, Appellants contend that the trial court erred in entering the April 5, 2022 order granting Appellees' petition to dissolve LSI. Appellants first argue that dissolution was foreclosed by the terms of the 2021 Operating Agreement. Appellants' Brief at 39. Appellants also assert that dissolution was not raised properly in the trial court. *Id.* at 40. Further, Appellants contend that, assuming the 2012 Operating Agreement remains in force, the trial court erred in dissolving LSI because Section 7.11 of the 2012 Operating Agreement mandated binding mediation.[7] *Id.* at 41-46.

We reiterate here that we agree with the trial court that the 2012 Operating Agreement remains in effect, and that the 2021 Operating Agreement is a nullity. Therefore, Appellants' argument that the dissolution of LSI was foreclosed by the terms of the 2021 Operating Agreement is meritless and no relief is due.

Next, Appellants assert that the issue of LSI's dissolution was not properly raised before the trial court. Appellants' Brief at 40. Appellants argue

_____

[7] Binding mediation is a form of ADR. *See Armstrong World Indus., Inc. v. Travelers Indem. Co.*, 115 A.3d 342, 346 (Pa. Super. 2015) (stating that ADR is defined as "[a] procedure for settling a dispute by means other than litigation, such as arbitration or mediation." (quoting BLACK'S LAW DICTIONARY (9th ed. 2009)). Moreover, ADR is a matter of contract. *See*, *e.g.*, *Humphrey v. GlaxoSmithKline PLC*, 263 A.3d 8, 14 (Pa. Super. 2021).

that dissolution must be specifically pleaded as a cause of action in a complaint or in a counterclaim. *See id.* Appellants contend that the issue of dissolution was not before the trial court until Appellees raised it in a motion for dissolution on May 25, 2021. *See id.* at 41.

It is well settled that Pennsylvania is a fact pleading jurisdiction. *See Griffin v. Rent-A-Center, Inc.*, 843 A.2d 393, 395 (Pa. Super. 2004) (*per curiam*). Indeed, this Court has explained:

> Pennsylvania is a fact pleading rather than a notice pleading jurisdiction. As a result, courts are presumed to know the law and plaintiffs need only plead facts constituting the cause of action and the courts will take judicial notice of the statute involved. The plaintiff is not required to specify the legal theory . . . underlying the complaint.

*Griffin*, 843 A.2d at 395 (formatting altered and citations omitted).

With respect to dissolution of an LLC, 15 Pa.C.S. § 8871 provides that an LLC may be dissolved and its activities and affairs wound up when "it is not reasonably practicable to carry on the company's activities and affairs in conformity with the certificate of organization and the operating agreement[.]" 15 Pa.C.S. § 8871(a)(4)(ii).

Instantly, the trial court correctly observed that Pennsylvania is a fact pleading state and that "[a]s such, causes of action and legal theories need not specifically be alleged in a complaint, as long as the legally operative facts underlying those causes of action have been pleaded." Trial Ct. Op., 6/29/22, at 6 (citation omitted). Further, the trial court explained:

Here, the legally operative facts upon which [Appellees'] Petition to Dissolve was brought were sufficiently plead in [Appellees'] Complaint and were sufficient to support a cause of action to dissolve the company. [Appellees] plead that [Appellants] attempted to execute [an] agreement[] that would remove [Appellees] from LSI in violation of the 2012 Operating Agreement and that the personal relations between the parties are dissentious. Further[,] facts to support dissolution were developed and litigated as the case progressed. Even if it was error for [the trial c]ourt to allow dissolution when that cause of action was not specifically pleaded in [Appellees'] Complaint, it was harmless error. [Appellants] were aware of legally operative facts at issue in this case and had an opportunity to prepare a defense and be heard in court on the matter of dissolution. As such, [the trial c]ourt's Order dissolving the company should not be reversed for this reason.

*Id.*

On this record, we conclude that Appellees pled sufficient operative facts in their complaint to establish a cause of action for dissolution. In their complaint, Appellees pleaded that the 2012 Operating Agreement controlled the governance of LSI. Compl., 1/12/21, at ¶¶ 21, 59. Appellees complained that Appellants were in breach of the 2012 Operating Agreement and asked the trial court to enjoin Appellants from actions taken that were not in conformity with the 2012 Operating Agreement, and to take further necessary action at law and equity. *See id.* at ¶¶ 36, 46. Appellees alleged that Appellants were attempting to wrest control over LSI such that it deprived Appellees of their rights and property interests. *See id.* at ¶ 57. Appellees further requested that the trial court impose a constructive trust to protect Appellees' interests. *See id.* at ¶¶ 60, 61. As the trial court noted, it was evident that Appellees alleged that the operations of LSI were impracticable,

the facts asserted a claim for winding up and dissolving LSI, and the trial court was permitted to take judicial notice of the relevant statute involved. **See** Trial Ct. Op., 6/29/22, at 6-7, 15; **see also** 15 Pa.C.S. § 8871(a)(4)(ii). On this record, we conclude that the trial court did not err in considering the issue of dissolution and no relief is due.

Next, we address the propriety of the trial court's order dissolving LSI. Appellants argue that even if the trial court was correct in finding that the 2012 Operating Agreement remains controlling and "assum[ing] *arguendo* that the 2012 Operating Agreement governs LSI's affairs," dissolving LSI was premature because of the ongoing conflicts among the parties, that binding mediation is mandated under Section 7.11 of the 2012 Operating Agreement, and that binding mediation has not occurred. Appellants' Brief at 40, 41-47.[8]

As stated, LSI is a Pennsylvania LLC which is governed pursuant to the Pennsylvania Associations Code and Pennsylvania Uniform LLC Act. **See** 15 Pa.C.S. § 101; **see also id.** at §§ 8102, 8811-8898 (addressing regulation, formation, and applicability to partnerships, LLCs, and corporate forms of

---

[8] In their January 19, 2021 preliminary objections, Appellants specifically raised the mediation provisions. **See** Prelim. Obj., 1/19/21, at ¶¶ 7-15. Accordingly, Appellants did not waive alternative dispute resolution. **See**, **e.g.**, **O'Donnell v. Hovnanian Enter., Inc.**, 29 A.3d 1183, 1187 (Pa. Super. 2011).

organization). Section 8871 of the Uniform LLC Act addresses dissolution of an LLC and provides as follows:

**(a) General rule**.—A limited liability company is dissolved, and its activities and affairs shall be wound up, upon the occurrence of any of the following:

(1) An event or circumstance that the operating agreement states causes dissolution.

(2) The consent of all the members.

(3) The passage of 180 consecutive days after the company ceases to have any members unless before the end of the period:

(i) consent to admit at least one specified person as a member is given by transferees owning the rights to receive a majority of distributions as transferees at the time the consent is to be effective; and

(ii) at least one person becomes a member in accordance with the consent.

(4) On application by a member, the entry by the court of an order dissolving the company on the grounds that:

(i) the conduct of all or substantially all the company's activities and affairs is unlawful;

(ii) it is not reasonably practicable to carry on the company's activities and affairs in conformity with the certificate of organization and the operating agreement; or

(iii) the managers or those members in control of the company:

(A) have acted, are acting, or will act in a manner that is illegal or fraudulent; or

(B) have acted or are acting in a manner that is oppressive and was, is or will be directly harmful to the applicant.

> **(b) Other remedies**.—In a proceeding brought under subsection (a)(4)(iii)(B), the court may order a remedy other than dissolution.

15 Pa.C.S. § 8871(a)-(b). Moreover, "[a] dissolved [LLC] shall wind up its activities and affairs, and the company continues after dissolution only for the purpose of winding up." 15 Pa.C.S. § 8872(a). We note that the application of a statute is a question of law, and our scope of review is plenary and our standard of review is *de novo*. ***See E.C.S. v. M.C.S.***, 256 A.3d 449, 454 (Pa. Super. 2021).

As discussed above, we conclude that the 2012 Operating Agreement remains in force, and the parties continue to be bound by its terms. ***See*** 15 Pa.C.S. §§ 8815, 8816(a). With respect to dissolution, the 2012 Operating Agreement states:

> (a) The Company shall be dissolved only upon the occurrence of any of the following events:
>
> > (1) by the written agreement of Members holding a Two-Thirds Interest;
> >
> > (2) by an order of a court of competent jurisdiction in an action commenced by any Member in which the Member can show that:
> >
> > > (i) Except as set forth in **Section 7.11** of this Agreement, the Members are deadlocked in the management of the Company's affairs, and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted, because of the deadlock;
> > >
> > > (ii) The Officers or other Members in control of the Company have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent;

(iii) There have been repeated, material breaches of the Agreement by the Company or by other Members or Officers; or

(iv) It is otherwise not reasonably practicable to carry on the business in conformity with the Operating Agreement.

Notwithstanding anything to the contrary in the Act, the Company shall not be dissolved upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of an Equity Owner.

(b) As soon as possible following the occurrence of any of the events specified in **Section 12.1(a)** effecting the dissolution of the Company, the appropriate representative of the Company shall execute all documents required by the Act at the time of dissolution and file or record such statements with the appropriate officials.

2012 Operating Agreement at Section 12.1 (emphases in original).[9]

Section 7.11 of the 2012 Operating Agreement contemplates a deadlock

in certain matters and provides as follows:

7.11 Dispute Resolution for Members. In the event that the Members are deadlocked and cannot come to an agreement with respect to any decision of the Company (including any items referred to the Members pursuant to Section 5.15 of this Agreement [involving dispute resolution for officers]), the Members hereby agree to submit any and all such disputes between them to binding mediation in accordance with the provisions set forth on Exhibit 7.11 attached hereto and made a part hereof. Any decision reached by the mediator shall be final and binding upon the Members.

---

[9] Appellants contend that Appellees waived argument concerning Section 12.1(a)(2)(ii) and (iii). **See** Appellants' Supplemental Brief at 7. We disagree. Even if Appellees had not raised these subsections, this Court has the authority to affirm the trial court's order on any proper basis. **See Cardona v. Buchanan**, 230 A.3d 476, 478 (Pa. Super. 2020); **see also Commonwealth v. Moore**, 937 A.2d 1062, 1073 (Pa. 2007) ("an appellate court may affirm a valid judgment based on any reason appearing as of record, regardless of whether it is raised by the appellee" (citation omitted)).

2012 Operating Agreement at Section 7.11 (some formatting altered).

The record reflects that on August 4, 2021, the trial court appointed John R. McGinley, Jr., Esquire, as an interim custodian of LSI. *See* Trial Court Order, 8/4/21, at ¶ 1. The trial court directed Attorney McGinley to make findings of fact and conclusions of law "as to whether the Members [of LSI] are deadlocked in the management of [LSI's] affairs and/or whether it is reasonably practicable for the Members of LSI to carry on the business of LSI in conformity with the provisions of LSI's [2012] Operating Agreement." *Id.* at ¶ 2. In his findings of fact and conclusions of law, Attorney McGinley stated:

> 49. The Custodian concludes that each side is intractable in its belief and in good faith differ on how to manage LSI, conduct its business and whether Michael should remain the CEO and President of LSI. The differences have resulted in the litigation before [the trial court], litigation in Florida and efforts to replace Michael and reconstitute LSI as a manager-managed, Florida limited liability company.
>
> 50. The holders of the "Voting Interests" of LSI[10] are deadlocked. Their disagreements are not over issues that arise in the day-to-day operation of a business, but rather go to the core issues such as the governing law applicable to a limited liability company, the allocation of voting rights, hence power among members, and the primary areas of corporate investment.
>
> *        *        *
>
> 71. The Custodian concludes that Michael and Bryan, the members of LSI of who have Voting Interests, are deadlocked. The deadlock manifests itself at two levels. They are deadlocked on the appropriate business plan for LSI and they are deadlocked on the election of Officers. Bryan and Michael, the holders of the

---

[10] As stated, only Bryan and Michael have "voting interests." *See* 2012 Operating Agreement at Section 1.39.

Voting Interests, cannot agree on the Officers of LSI or who should direct its day-to-day business affairs. Bryan, Eugene and Marie's attempt to oust Michael as the CEO and President and their attempt to convert LSI to a manger-managed, Florida limited liability company and amend the 2012 Operating Agreement, further evidences this dysfunction and deadlock.

72. Accordingly, the Custodian concludes as follows:

The Members who control Voting Interests decisions are deadlocked – neither Michael nor Bryan will yield to the other and comity among the Members has dissolved.

\* \* \*

77. Section 7.11 of the 2012 Operating Agreement also contemplates a dispute resolution mechanism for Members. It provides:

In the event that the Members are deadlocked and cannot come to an agreement **with respect to any decision of the Company** . . ., the Members hereby agree to submit any and all such disputes between them to binding mediation[.]

78. The predicate for disagreement among members is limited to a "decision of the Company." While some of the disagreements in this case deal with the direction of [LSI] and thus its business plans, others are disagreements not with respect to [LSI] but rather disagreements in their capacity as Members. The architecture of the dispute resolution may aid in connection with certain of the disputes among the parties but is of little help with regard to the core disputes among the Members. For example, the decision to advocate a change from a member-managed limited liability company, to a manager-managed limited liability company is a decision taken as a member. It is a governance decision adopted by the members rather than a "decision of the Company." Indeed, that analysis may have been the reason why in the first instance Bryan, Eugene and Marie attempted to oust Michael and amend the 2012 Operating Agreement rather than take their concerns to a mediator pursuant to section 7.11 of the 2012 Operating Agreement.

\* \* \*

80. Section 7.11 may offer some limited vehicle for deciding conflicts that arise among members, relating to the decisions of the Company, but it does not encompass all of the deeper disputes among the Members. Section 7.11 is inapplicable to differences on whom to elect as Officers. The selection of Officers is the prerogative of the owners of the Voting Interests and its deeply divided between Michael and Bryan.

\* \* \*

93. The parties have attempted a conventional mediation with Attorney David White, an accomplished and respected mediator. That effort failed.

94. Based upon the diverging viewpoints among the holders of the Voting Interests, the Custodian finds that there is an irreconcilable deadlock on certain operational issues "with respect to any decision of the Company" within the meaning of section 7.11 of the 2012 Operating Agreement. If such operational disputes constituted exclusive issues among the parties, such issues would be a matter for mediation under the 2012 Operating Agreement. In this case, day-to-day decisions are not the primary issues.

Interim Custodian's Findings of Fact and Conclusions of Law, 10/15/21, at ¶¶ 49, 50, 71, 72, 77, 78, 80, 93, 94 (emphasis in original).

As stated, under the Pennsylvania Uniform LLC Act, a court may dissolve an LLC upon petition by a member when "[a]n event or circumstance[s] that the operating agreement states causes dissolution" occurs, or "it is not reasonably practicable to carry on the company's activities and affairs in conformity with the certificate of organization and the operating agreement[.]" 15 Pa.C.S. § 8871(a)(1), (a)(4)(ii). Moreover, the 2012 Operating Agreement provides that the company shall be dissolved if "[e]xcept as set forth in **Section 7.11** of this Agreement [(concerning decisions of the company)], the Members are deadlocked in the management

of the Company's affairs, and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted, because of the deadlock[.]" 2012 Operating Agreement at Section 12.1(2)(i) (emphasis in original).

The trial court addressed dissolution of LSI as follows:

Although Pennsylvania case law is sparse on what circumstances are sufficient to give rise to a ground for dissolution, a court may look to dissolution in similar forms of business associations, such as partnerships and close corporations, for guidance. ***Slaiger v. Holohan***, 100 A.3d 622, 624 (Pa. Super. 2014). This [c]ourt is also guided by persuasive authority from other jurisdictions in determining the contours of deadlock and impracticability. Because the analyses and facts to support a finding of deadlock and impracticability are virtually indistinguishable in this case, this [c]ourt's analysis will treat them as one and the same. Ultimately, there are three major factors in this case that support such a finding: (1) [Appellants'] violation of the 2012 Operating Agreement in order to circumvent Michael's control and management of the LLC, (2) the irreconcilable views of both parties over major structural decisions of the LLC, and (3) the utter distrust and animosity between the parties personally.

Trial Ct. Op., 6/29/22, at 7. The trial court further addressed the factors supporting its conclusion that dissolution was proper:

In ***Staiger***, the Superior Court upheld a dissolution of an LLC where there were two fifty percent (50%) members "such that when they disagree, the result is a deadlock and decisions cannot be made pursuant to the operating agreement." [***Staiger***, 100 A.3d] at 625. The Pennsylvania Supreme Court has cautioned, however, that "[a] going and prosperous business will not be dissolved merely because of friction among the partners; [equity] will not interfere to determine which contending faction is more at fault." ***Potter v. Brown***, 195 A. 901, 904 (Pa. 1938). The Superior Court distinguished the type of friction that arose in ***Potter*** with the type of friction between the members in ***Staiger***. Whereas in ***Potter*** the defendant partner had not conducted

himself in any way other than in accordance with the partnership agreement, the defendant member in ***Staiger*** unilaterally excluded the plaintiff member from management decisions, in violation of the membership agreement, in order to bypass the need for the unanimous consent of both members. ***Staiger***, 100 A.3d at 625.

In ***Potter***, the plaintiffs' grievances stemmed from the fact that they lacked management rights in the company, for which the plaintiffs failed to bargain when they signed the partnership agreement. The plaintiffs' action in equity did not lie where the defendant, whose sole control over management of the partnership was vested by the agreement, would not relinquish those rights. [Appellants] here are no different. [Appellants] are parties to a membership agreement that requires Michael's consent in order to make the structural changes to LSI that [Appellants] desire. In an attempt to circumvent this roadblock, [Appellants] sought to unilaterally alter the power structure and jurisdictional home of LSI in violation of the 2012 Operating Agreement. This is the same type of conduct that warranted dissolution in ***Staiger***.

[Appellants] have contended that, since the commencement of this litigation, they have allowed Michael to remain in control of the company and to run the day-to-day operations. As such, Michael has not been excluded from management of the company. However, [Appellants] overlook the critical detail that this would not be the case were it not for this [c]ourt's intervention in the matter. But for this [c]ourt's injunction, Michael likely would still be physically locked out of the company's offices and without access to the company's email or computer systems. Moreover, Michael's management of the day-to-day has allowed the company to remain operational, but this status quo is not sustainable long-term. The status quo still fails to address the other major roadblocks to practicably operating the business, namely the parties' disparate visions for LSI's future and the parties' mutual animosity.

Trial Ct. Op., 6/29/22, at 7-9. The trial court also discussed the irreconcilable

positions of both parties over structural decisions of LSI:

Due to the dearth in Pennsylvania case law addressing deadlock and dissolution,[11] this [c]ourt looks to persuasive authority from other jurisdictions that have more closely analyzed the issue. The Supreme [Judicial] Court of Massachusetts collected a variety of authorities from other jurisdictions to analyze the circumstances that give rise to deadlock and found the following four common factors: (1) the existence of a stalemate between the members on the primary functions of management, including business strategy; (2) the size of the business association, where a 50-50 split of decision-making authority between two members makes impasses more irreconcilable; (3) whether a party has purposefully engineered a deadlock; and (4) the degree and extent of distrust and antipathy between the members. *Koshy v. Sachdev*, 81 N.E.3d 722, 730-31 (Mass. 2017).

Here, the voting shares of LSI, and hence the decisional authority to make the kinds of structural changes to LSI over which the parties disagree, is split equally between Michael and Bryan.[FN8] This makes the differences between the parties all the more likely to be incapable of resolution. *See Black v. Graham*, 464 S.E.2d 814, 815 (Ga. 1996) (finding that a company owned in equal shares by two contending parties who could not agree on business decisions presented the "classic situation of deadlock" and warranted dissolution). This is especially so where the parties disagree over rather fundamental issues of business governance, such as whether Michael should remain in control of the company's management. The parties also disagree as to the types of products and services LSI should offer, the type of clients it should pursue, the tax classification of the business, its headquarters, and its state of incorporation.

[FN8] 2012 Operating Agreement, art. 1.39.

Furthermore, Michael has done nothing to engineer this deadlock. Michael is not the party that seeks to alter the company's operating agreement, that has violated the operating agreement, or that has breached his fiduciary duties to other members.

---

[11] We note that although decisions from the courts of common pleas are not binding authority, they may be considered persuasive. *See Darrow v. PPL Elec. Utilities Corp.*, 266 A.3d 1105, 1112 n.6 (Pa. Super. 2021). Similarly, decisions of courts in other states are not binding but may cited for their persuasive value. *See Umbelina v. Adams*, 34 A.3d 151, 160 n.3 (Pa. Super. 2011).

Instead, [Appellants'] conduct has resulted in LSI's deadlock for the purpose of seeking a forced buy-out of Michael's interest. This [c]ourt cannot, in the interests of equity, reward [Appellants'] violative conduct by giving them exactly what they intended to accomplish: forcing Michael out of the company.

\* \* \*

The [next] factor considered by the Massachusetts Supreme Court [in **Koshy**] was mutual animosity between the members of the company. **Koshy**, 81 N.E.3d at 731 ("Mutual antipathy can transform what may begin as a run of the mill disagreement into irreconcilable conflict and stalemate where hostility precludes compromise.").

In this case, any trust the parties may have had in each other and willingness to compromise was irretrievably lost when [Appellants] went behind [Appellees'] backs to force them out of the company. [Appellants] did not just stop at executing the purported agreement without Michael's knowledge o[r] consent, but they prevented Michael's access to LSI's offices, emails, and computers. [Appellants] went even further to spread rumors amongst employees that Michael was mentally unwell and no longer able to lead the company, despite having no reasonable basis for such accusations.[FN9] [Appellants] have taken the position, conveniently after the institution of the current proceedings against them, that they have been willing to compromise during mediation and that [Appellees] have not.[FN10] However, at no point before [Appellants'] unilateral attempt to remove Michael from LSI did they reach out to Michael to try to resolve their differences amicably. Instead, [Appellants] created an atmosphere of hostility from the start and tarnished any possibility of rebuilding trust.

[FN9] Dr. Robert Marzano confirmed, when interviewed by the Custodian, that [Appellants] rumored that Michael had stepped down from leadership in LSI due to emotional or mental problems.

[FN10] Article 7.11 of the 2012 Operating Agreement requires the parties to pursue alternative dispute resolution before seeking dissolution. As noted above, these attempts at resolution have proved unfruitful, reinforcing the determination that the parties are deadlocked.

- 44 -

Moreover, the personal and familial nature of the dispute that underlies this deadlock is such that "hostility precludes compromise." **Koshy**, 81 N.E.3d at 731. It is the unfortunate but frequent truth that closely held businesses will often be unable to overcome personal differences and animosity that develops wholly apart from any business-related disagreements. Michael testified that he is not on speaking terms with either his mother, father, or brother. His father also made his antipathy known in testimony, describing Michael as "a snot," "extremely vain," "condescending," "arrogant," and possessing a "debased character."[FN11] **See id.** at 732 ("The record is replete with personal insults, questioning of motives, and general acrimony between the parties."). Even during discovery in the parties' concurrent litigation in Florida state court,[FN12] [Appellants] sought to compel production of immigration and work authorization status from Michael's wife, who is a lawful immigrant. Given the irrelevance of this information to the parties' dispute, one can only assume this request was made out of spite. This is preeminently demonstrative of the parties' personal animosity. Such dispositions are not conducive of compromise and are unlikely to be resolved — indeed, have not been resolved — through legal dispute resolution.

[FN11] July 20, 2021 Hrg. Tr. at 138:15-19, 142:11-25, 143:1-2.

[FN12] **Toth v. Toth**, No. 50-2021-CA 003506-XXXX-MC (Fla. 15th Cir. Ct., filed Mar. 16, 2021).

\* \* \*

In considering whether deadlock or the impracticability of carrying on the business presents irreparable harm to the company, a court cannot only look to the company's short-term profitability, but to the likelihood of its long-term success. **Koshy**, 81 N.E.3d at 733-34. Additionally, financial harm is not the only thing a court may consider; a court may also "take into account factors like 'harm to a corporation's reputation, goodwill, customer relationships, and employee morale.'" **Shawe v. Elting**, 157 A.3d 152, 161 (Del. 2017) (internal citations omitted).

Although [Appellants] have allowed [Appellees] to maintain business operations as normal, enabling t[he] company to maintain a slight margin of profitability during the course of litigation, as long as the parties' relationship remains acrimonious

and intractable it will be impossible to make long-term decisions for LSI. Once the specter of this [c]ourt's supervision over the parties' behavior is gone, it seems unavoidable that the parties will slide back towards the same maneuvering and jockeying for control of the company that caused this litigation to ensue in the first place. The parties' irreconcilable differences are such that any short- or long-term decision on behalf of LSI is likely to be challenged with litigation, as the parties have demonstrated their unwillingness to compromise amicably. The continued threat of divisiveness and litigation will likely exhaust the company's financial resources and scare away customers.

This litigation has already had such an effect on LSI's employees and business partners. It has thus far caused the apprehension of Dr. Marzano, whose licensed evaluation model is critical for LSI's current financial success. In a letter to LSI, Dr. Marzano stated that he would no longer license his model to LSI if the parties continued to litigate and if Michael ceased to manage the company. Likewise, other essential personnel have resigned, such as LSI's former Finance Manager, Michelle Dean, who has stated that she will only return to the company once the litigation has ended, and only if Michael continues to run the company. Thus, LSI is not only at risk of revocable financial loss, but irrevocable loss of intellectual property, talent, employee satisfaction, and reputation. In such circumstances, a finding of deadlock or impracticability is appropriate.

Trial Ct. Op., 6/29/22, at 9-13 (some formatting altered).

The trial court further explained that ordering dissolution of LSI was an

equitable remedy:

Although Pennsylvania's Business Corporation Law specifically authorizes dissolution, 15 Pa.C.S. § 8871, this does not otherwise limit a court's powers of equity to fashion other appropriate remedies. 15 Pa.C.S. § 104;[12] **Baron v. Pritzker**, 52 Pa. D. &

---

[12] "Except to the extent otherwise provided in this title in cases where a statutory remedy is provided by this title, the court shall have the powers of a court of equity or chancery insofar as those powers relate to the supervision
*(Footnote Continued Next Page)*

C.4th 14, 19 (Pa. Ct. Com. Pl. 2001). A court is not required by the statute to grant dissolution upon a showing of deadlock but may grant equitable relief as it deems necessary. **Baron**, 52 Pa. D. & C 4th at 19. "Courts sitting in equity hold broad powers to grant relief that will result in an equitable resolution of a dispute." **Williams Twp. Bd. of Supervisors v. Williams Twp. Emergency Co., Inc.**, 986 A.2d 914, 921 (Pa. Commw. Ct. 2009); **see also Matter of Kemp & Beatley, Inc.**, 473 N.E.2d 1173, 1179 (N.Y. 1984) ("The appropriateness of an order of dissolution is in every case vested in the sound discretion of the court considering the application."). However, "[t]here is no hard and fast rule applicable alike to all partnership dissolutions; rather, 'a wide discretion is necessarily vested in a court of equity.'" **Hankin v. Hankin**, 420 A.2d 1090, 1108 (Pa. Super. Ct. 1980). Again, due to the dearth in Pennsylvania precedent, this [c]ourt is guided by persuasive authority.

As such, courts in other jurisdictions have held that dissolution should not be granted merely because the statutory requirement of deadlock was met, but also where equitable considerations warrant dissolution as a remedy. **See, e.g., Henry George & Sons, Inc. v. Cooper-George, Inc.**, 632 P.2d 512, 517 (Wa. 1981). A court should consider whether dissolution would be beneficial to all members, the company, and the public. **Id.**; **Hankin**, 420 A.2d at 1108-09. A court should determine "whether some remedy short of or other than dissolution constitutes a feasible means of satisfying both the petitioner's expectations and the rights and interests of [the other members.]" **Matter of Kemp & Beatley**, 473 N.E.2d at 1180. "[B]ut when fulfillment of the oppressed petitioner's expectations by these means is doubtful, such as when there has been a complete deterioration of relations between the parties, a court should not hesitate to order dissolution." **Id.**

A court should also consider the seriousness of the deadlock or dissension between the parties. **Henry George & Sons**, 632 P.2d at 517. For example, Pennsylvania courts, as well as courts of other states, have found dissolution warranted where the

---

and control of corporations and other associations." 15 Pa.C.S. § 104. "Our standard of review in equity matters is limited to determining whether the trial court committed an error of law or an abuse of discretion." **Coldren v. Peterman**, 763 A.2d 905, 907 (Pa. Super. 2000) (citation omitted).

deadlock goes beyond mere disagreement and one partner or shareholder attempts to freeze out or oust the other. *See Staiger*, 100 A.3d at 625; *Delaney v. Georgia-Pacific Grp.*, 564 P.2d 277, 288 (Or. 1977) (dissolution warranted where defendant shareholder's effective ouster of the plaintiff shareholder from management was unjustified and a breach of fiduciary duty).

This [c]ourt's determination as to the appropriate equitable remedy is reviewed for abuse of discretion. *See Hankin*, 420 A.2d at 1109 (applying abuse of discretion standard). "[A]ppellate review of equity matters is limited to a determination of whether the chancellor committed an error of law or abused his discretion. The scope of review of a final decree in equity is limited and will not be disturbed unless it is unsupported by the evidence or demonstrably capricious." *First Capital Life Ins. Co. v. Schneider, Inc.*, 608 A.2d 1082, 1084 (Pa. Super. 1992) (internal citations omitted).

This [c]ourt did not err or abuse its discretion by dissolving LSI and fashioning an appropriate remedy by adopting [Appellees'] proposed plan of dissolution.[FN13]  The facts in this case warrant dissolution because any other form of equitable relief, including the forced buy-out that [Appellants] suggest, would have been inadequate to satisfy [Appellees'] expectations and would not have been in the best interests of LSI.  This [c]ourt appropriately found that the parties are hopelessly deadlocked and that their differences are irreconcilable.  Both the 2012 Operating Agreement[FN14] and Pennsylvania's statute authorize dissolution on these grounds.  15 Pa.C.S. § 8871(a)(1), (a)(4)(ii).  The instant deadlock is serious enough to justify dissolution, where here, as in the case law cited above, [Appellants] attempted to force [Appellees] out of the company in violation of the Operating Agreement and in breach of their fiduciary duties.

[FN13] Michael D. Toth's Amended Petition to Dissolve. Ex. A.

[FN14] 2012 Operating Agreement, art. 12.1.

Ordering a forced buy-out, as [Appellants] requested of this [c]ourt, would have been wholly inconsistent with the exercise of this [c]ourt's equitable powers.  This action was initially brought by [Appellees] to enjoin [Appellants] from forcing them out of the company in violation of the terms of the Operating Agreement.  Rather than unlawfully seize control of the company, [Appellants]

- 48 -

would have this [c]ourt judicially order Michael's departure. As such, [Appellants] have requested, with unclean hands, that this [c]ourt order a form of equitable relief more favorable to them. [Appellants] suggest that it would be equitable for this [c]ourt to grant a form of relief not much different from the conduct that [Appellees] requested this [c]ourt to enjoin in the first place. It was not an abuse of discretion, therefore, for this [c]ourt to order dissolution, finding that a forced buy-out would be inadequate to remedy [Appellees'] grievances. A forced buy-out also likely would have had poor consequences on LSI, as none of [Appellants] are nearly as well-versed in the business's management, and multiple employees and business partners have expressed their unwillingness to work with [Appellants]. A forced buy-out would have been, for all intents and purposes, the least equitable form of relief.

Moreover, the relief actually granted by this [c]ourt is not as drastic as [Appellants] contend. Although this [c]ourt ordered a "dissolution," as it were, it provided more specifically for LSI to continue as a going concern in the form of two separate companies, one owned by [Appellees] and one owned by [Appellants]. According to the dissolution plan, each of these companies will have free and unfettered access to LSI's intellectual property, the right to offer employment to all of LSI's current employees, and to solicit business from all of its current clients.[FN15] Not only does this plan permit LSI to continue operations as normal, it allows [Appellants] to pursue their vision of the company without being hindered by deadlock. [Appellants] will be the sole members of their own LSI spinoff. Should they choose, [Appellants] are free to employ a new CEO and President, as was their wish. [Appellants] are free to develop different types of products and clients, as was their wish. [Appellants] are free to execute a new operating agreement that incorporates the company under Florida law. [Appellants] will also be entitled to a distribution of seventy-five percent (75%) of LSI's remaining assets, according to their *pro rata* equitable share of the company, upon dissolution.

[FN15] Michael D. Toth's Amended Petition to Dissolve, Ex. A.

As such, this [c]ourt's "dissolution" was, in fact, a narrowly tailored plan to remove the deadlock that would have inhibited the success of LSI in the long-term. The plan then provides a means for both parties to pursue their separate visions for LSI without

the need for further litigation and disharmony. The decision to grant this equitable relief cannot be described as "demonstrably capricious" and, therefore, not an abuse of discretion. ***First Capital Life Ins. Co.***, 608 A.2d at 1084.

Trial Ct. Op., 6/29/22, at 13-17 (some formatting altered).

After review of the trial court's thorough discussion and disposition, we agree with the trial court's conclusion. Section 7.11 of the 2012 Operating Agreement addresses binding mediation when the members are deadlocked only over decisions of the company. However, under the circumstances presented in the instant case, the parties became deadlocked over far more than decisions of the company, and instead were deadlocked over fundamental decisions about the company itself, including corporate governance, structure, and leadership. ***See*** Trial Ct. Op., 6/29/22, at 9; Interim Custodian's Findings of Fact and Conclusions of Law, 10/15/21, at ¶¶ 78, 80. As the trial court stated, the parties have previously engaged in mediation and settlement negotiations, which were fruitless. ***See*** Trial Ct. Op., 6/29/22, at 4, 11 n.10. Further, the LLC Act precludes an operating agreement from varying grounds for judicial dissolution set forth in 15 Pa.C.S. § 8871(a)(4). ***See*** 15 Pa.C.S. § 8815(c)(15). As noted, Section 8871 clearly provides that a member of the LLC may seek judicial dissolution when "it is not reasonably practicable to carry on the company's activities and affairs in conformity with the certificate of organization and the operating agreement[.]" 15 Pa.C.S. § 8871(a)(4)(ii).

The record supports the trial court's conclusion that there are "irreconcilable differences that will only cause harm to [LSI] if continued to persist." Trial Ct. Op., 6/29/22, at 3; *see also* Interim Custodian's Findings of Fact and Conclusions of Law, 10/15/21, at ¶¶ 78, 80. The 2012 Operating Agreement provides that the company shall be dissolved if "the Members are deadlocked in the management of the Company's affairs, and irreparable injury to the corporation is threatened or being suffered[.]" 2012 Operating Agreement at 12.1(2)(i). We reiterate that a court may dissolve an LLC upon petition by a member when "[a]n event or circumstance[s] that the operating agreement states causes dissolution" occurs, or "it is not reasonably practicable to carry on the company's activities and affairs in conformity with the certificate of organization and the operating agreement." 15 Pa.C.S. § 8871(a)(1), (a)(4)(ii). As set forth above, the trial court clearly explained the facts of this matter, the deadlock between the parties, the injury and harm to LSI, and that it was not practicable for the company to continue. *See* Trial Ct. Op., 6/29/22, at 7-17. Indeed, the trial court explained that injury to LSI was not merely "threatened," injury was already occurring. *See id.* at 12; *see also* 2012 Operating Agreement at 12.1(2)(i). We agree with the trial court and conclude that any additional efforts to mediate would be a waste of resources and would only serve to cause further delay and harm to LSI. Therefore, we discern no error of law or abuse of discretion in the trial court concluding that the parties are deadlocked, finding that it is not reasonably

practicable to carry on LSI's activities, and ordering the dissolution of LSI. *See* Trial Ct. Op., 6/29/22, at 17; *see also* 2012 Operating Agreement at Section 12.1; 15 Pa.C.S. § 8871(a)(1), (a)(4)(ii). Accordingly, we affirm the order on appeal at 403 WDA 2022.

## Appeal at 846 WDA 2022

As noted above, after the trial court ordered dissolution of LSI on April 5, 2022, Appellants filed the appeal docketed at 403 WDA 2022 and filed a motion for a stay with this Court. Trial Ct. Op., 9/2/22, at 1-2. This Court granted Appellants' motion for a stay on June 16, 2022. *See id.* at 2. On June 28, 2022, Appellees sought temporary relief from the stay in order to petition the trial court to appoint a custodian to manage LSI pending the resolution of Appellants' appeal. *See id.* By order dated June 29, 2022, the Superior Court temporarily lifted the stay for the limited purpose of having the trial court rule on Appellees' petition to appoint a custodian. *See id.* On July 15, 2022, the trial court heard argument on the petition to appoint the receiver, and on July 21, 2022, the trial court granted Appellees' petition and appointed James Chiafullo, Esquire.[13] *See id.* Thereafter, Appellants filed the appeal docketed at 846 WDA 2022.

Appellants argue that Appellees' motion to appoint a custodian violated this Court's stay order and that there was no emergency or necessity. *See*

---

[13] The trial court had previously appointed Mr. Chiafullo as liquidating trustee in its April 5, 2022 order.

Appellants' Brief at 56-57. Appellants further contend that the appointment of a custodian was error because Michael owed a duty of loyalty to LSI. *See id.* at 57.

The appointment of a receiver or custodian is a decision left to the sound discretion of the trial court. *See Abrams v. Uchitel*, 806 A.2d 1, 8 (Pa. Super. 2002); *Bayles v. Hamrock*, 463 WDA 2022, 2023 WL 6878620, at *11 (Pa. Super. filed Oct. 18, 2023) (unpublished mem.).

> Among the factors that various courts have considered are the existence of dissension among the partners, dissipation of the partnership assets, fraud or mismanagement by the controlling partners, the denial of the plaintiff partner's rights as a partner, and the balance of necessity and benefits against injury incident to the appointment of a receiver.

*Hankin v. Hankin*, 420 A.2d 1090, 1103 (Pa. Super. 1980) (*Hankin I*) (citations omitted). The trial court may appoint a receiver to preserve the property and rights of the parties, and to prevent waste, dissipation of assets, fraud, or mismanagement. *See Hankin v. Hankin*, 493 A.2d 675, 677 (Pa. 1985) (*Hankin II*).

Appellants first argue that the trial court abused its discretion in appointing a custodian because it violated this Court's stay order. *See* Appellants' Brief at 56. However, as stated above, this Court specifically granted Appellees' motion to temporarily lift the stay for the purpose of permitting the trial court to rule on Appellees' motion to appoint a custodian.

*See* Superior Court Order, 7/29/22. Accordingly, we conclude that Appellants'

argument to the contrary is meritless.

The trial court addressed the remainder of Appellants' argument as

follows:

> [Appellants] argue that that the appointment of the receiver was not warranted under the circumstances and/or would cause them greater harm. To the contrary, appointment of a receiver is in [Appellants'] best interests and should have been sought by them prior to the recent events that precipitated [Appellees'] petition for a receiver. The issue, ultimately, is that [Appellants] wish to preserve LSI as a going concern in the event that the Superior Court would reverse this [c]ourt's dissolution order. While [Appellants] sought and obtained a stay of this [c]ourt's dissolution order, so that LSI would be protected from judicial dissolution, it took no steps to prevent its alleged *de facto* winding-up by Michael Toth. If [Appellants'] allegations that Michael acted contrary to LSI's interests are true, [Appellants'] have available remedies in law and equity, including the appointment of a receiver to preserve LSI's assets and protect their rights. Regardless of whether the current situation was "manufactured" by Michael or was caused by the specter of litigation, the uncertain future of the company, and the inability to retain employees, the fact remains that LSI is without a CEO and is threatened with the waste and/or dissipation of its assets. It is imperative that a neutral party preserves LSI's remaining assets and pay its obligations as they come due, in order to prevent any further waste.
>
> Another factor which moves this [c]ourt toward appointment of a receiver is the dissension among LSI's members. *See Hankin I*, 420 A.2d at 1103. There is no reconciling the conflicts of interest between Michael and [Appellants] in preserving LSI. It is for this same reason that [Appellants'] suggestion that Bryan Toth run the company instead of a receiver should be denied. Any actions taken on the company's behalf by Bryan would surely be met with resistance by Michael, who owns half the voting share in LSI. The best course to ensure that LSI's day-to-day operations continue without hinderance is the appointment of a receiver.

> The benefits of appointing a receiver in this case are balanced against the injury, if any, caused by the appointment. *Hankin I*, 420 A.2d at 1003. The only discernable harm to [Appellants] is that they will be prevented from exercising managerial control over LSI. As previously stated, allowing [Appellants] to manage the company instead of a receiver would cause unnecessary divisiveness. Therefore, there is substantial evidence to support this [c]ourt's appointment and [Appellants] cannot demonstrate that this was a clear abuse of the [c]ourt's discretion.

Trial Ct. Op., 9/2/22, at 5-6 (some formatting altered).

After review, we agree with the trial court's conclusions. We discern no abuse of discretion in the trial court's decision to appoint a custodian under the circumstances presented in this matter. *See Abrams*, 806 A.2d at 8. The trial court thoroughly explained that due to the significant dissension among the parties, the appointment of a custodian was necessary to prevent waste and dissipation of LSI's assets. *See Hankin II*, 493 A.2d at 677; *Hankin I*, 420 A.2d at 1103. Accordingly, we affirm the order on appeal at 846 WDA 2022.

**Appeal at 514 WDA 2023**

In the appeal at 514 WDA 2023, Appellants contend that the trial court's April 19, 2023 order approving the custodian's recommendation of a protective sale and assignment of assets exceeded the custodian's legal authority, because the custodian does not have legal authority to liquidate LSI's assets, and it violated this Court's stay order. *See* Appellants' Brief at 514 WDA 2023, at 5, 30. Appellants further argue that the sale and

assignment was a poor value proposition for LSI and constituted unlawful self-

dealing by Michael.  *See id.*

The trial court first addressed the scope of the authority its July 21, 2022

order:

Firstly, [Appellants] argue that Mr. Chiafullo had no authority to sell and/or license certain of LSI's assets as that would exceed the scope of Mr. Chiafullo's initial charge from this [c]ourt.  In this [c]ourt's Order of July [21], 2022, Mr. Chiafullo was charged with "assum[ing] the operations, management and control of [LSI], pay[ing] obligations and invoices as they come due, preserving dwindling assets and otherwise operat[ing] the business pending further direction and order of this [c]ourt . . . ."  While it is arguable that Mr. Chiafullo acted within the scope defined by this Court's July [21], 2022 Order, such an argument is not necessary.  Because this [c]ourt subsequently approved of Mr. Chiafullo's recommended actions by order of court, Mr. Chiafullo acted with the necessary authority.

This [c]ourt has the power to appoint a receiver pendente lite upon the filing of a petition for involuntary dissolution.  15 Pa.C.S. § 5984.  That receiver has "such powers and duties as the court from time to time may direct."  *Id.*  The powers of a receiver are subject to the court, as reflected in the orders of the court empowering the receiver.  *Katz v. Katz*, . . . 2014 WL 10575352, *7 (Pa. Super. Sept. 3, 2014) (quoting *Duplex Printing Press Co. v. Clipper Pub. Co.*, 62 A. 841-42 (Pa. 1906)).[14]  Moreover,

---

[14] Although the trial court cited *Katz*, a non-precedential unpublished decision of this Court, we note that the cases cited in *Katz* are precedential decisions. Indeed, "[t]he authority of a receiver and the effect of his action depend almost entirely on the purpose of his appoint[]ment and the extent of his powers conferred by the decree appointing him." *Duplex Printing Press Co. v. Clipper Pub. Co.*, 62 A. 841, 842 (Pa. 1906).  Even where a receiver acts without authority from the court in the first instance, his acts may be ratified by court approval, and "[t]he right of the court to approve and sanction that which it might have originally authorized cannot be disputed." *In re Wilson's Estate*, 97 A. 453, 454 (Pa. 1916) (citations omitted).

[s]ubsequent ratification and approval by a court also offers safe harbor for a receiver's activities." *Id.* at *8. Thus, this [c]ourt's initial charge in no way limits this [c]ourt from ordering, ratifying, or approving further actions of the receiver.

Here, Mr. Chiafullo sought explicit approval from this [c]ourt for the sale and licensing of certain of LSI's assets. Having approved Mr. Chiafullo's recommendation by order of court, this [c]ourt authorized Mr. Chiafullo to so act. Whether or not the custodian's actions were within the scope of authority initially granted to him when he was appointed is irrelevant.[15] Therefore, [Appellants'] contention that Mr. Chiafullo acted outside of the authority granted by this [c]ourt is without merit . . . .

Trial Ct. Op., 7/5/23, at 4-5 (unpaginated).

Appellants also argue that the trial court's order violates this Court's stay. *See* Appellants' Brief at 514 WDA 2023, at 31. Appellants contend that the trial court lacked the authority to convert Mr. Chiafullo's role as a custodian into the role of liquidating trustee in the April 19, 2023 order. *See id.* The trial court addressed this issue as follows:

[Appellants] argue that Mr. Chiafullo's actions — or rather this Court's approval of those actions — violate the Superior Court's Orders staying the dissolution of LSI and the liquidation of its assets by a receiver. [Appellants] make much of the narrow legal distinction between a receiver, as liquidator, and a custodian. *See O'Malley v. Desmond, Inc.*, 62 Pa. D.&C.2d 645, 647 (C.P. Phila. 1973) (A "receiver" liquidates a corporation[], while a "custodian" conducts the business of the corporation). However, this distinction means little in practice as a custodian or a receiver is authorized to act as the Court so directs.

A receiver or custodian is "the officer — the executive hand — of a court of equity. His duty is to protect and preserve, for the

---

[15] *See Wilson's Estate*, 97 A. at 454; *Duplex Printing Press Co.*, 62 A. at 842.

benefit of the persons ultimately entitled to it, an estate over which the court has found it necessary to extend its care." ***Warner v. Conn***, 32 A.2d 740, 741 (Pa. 1943) (quoting ***Schwartz v. Keystone Oil Co.***, 25 A. 1018, 1019 (Pa. 1893).[16] While Pennsylvania's business corporations statute contains a separate section for the appointment of a "custodian," it notably provides that "[a] custodian appointed under this section shall have all the power and title of a receiver appointed under Subchapter G of Chapter 19. . . ." 15 Pa.C.S. § 1767(c). Under Subchapter G of Chapter 19, the statute provides that a receiver pendente lite — or a custodian — may have "such powers and duties as the court from time to time may direct and proceed as may be requisite to preserve the corporate assets wherever situated and to carry on the business of the corporation. . . ." 15 Pa.C.S. § 1984. The only caveat to the appointment of a "custodian" that the statute provides is that the custodian shall not "liquidate [the corporation's] affairs and distribute its assets except when the court shall otherwise order." 15 Pa.C.S. § 1767(c).

Thus, the question is whether this [c]ourt ordered Mr. Chiafullo to liquidate LSI's affairs and distribute its assets, thereby dissolving the business in violation of the Superior Court's stay. Selling and/or licensing certain assets of a business as may be necessary to preserve the assets' value or to avoid liabilities is notably different from the liquidation and dissolution of a business. When a business is involuntarily dissolved, the legal existence of the business ceases and articles of dissolution are filed with the Department of State. 15 Pa.C.S. § 1989. Additionally, **all** of the business's remaining assets are distributed to its shareholders. ***Id.***

This [c]ourt's Order of April 19, 2023 falls far short of liquidating and distributing all of LSI's assets and dissolving the business's

---

[16] Under the circumstances presented here, we agree with the trial court that although the terms receiver and custodian are not identical, a receiver and custodian would have largely the same function and provide the company the same protections. ***See***, ***e.g.***, ***Simms v. Exeter Architectural Products, Inc.***, 868 F.Supp. 668, 671-72 (M.D. Pa. 1994); ***see also Toppy v. Passage Bio, Inc.***, 285 A.3d 672, 690 n.7 (Pa. Super. 2022) (stating "[a]lthough not binding on us, we may cite federal authority for its persuasive value." (citation omitted)).

legal existence. The Order directed Mr. Chiafullo to sell two of LSI's assets and license a third. These assets were (1) textbooks and tradeshow materials stored in warehouses, (2) contracts for conference rooms at Disney Land, and (3) LSI's proprietary iObservation software. In the case of two of those assets, the current state of LSI's affairs renders them useless and depreciating. The remaining asset presents more of a liability to LSI than an asset. In order to understand why the sale and licensing of these assets was necessary to preserve LSI's value for the benefit of all parties, it is important to look at the current state of LSI's business affairs.

Significantly, [Appellants'] initiation of the series of events which lead to this lawsuit has caused numerous tangible effects on LSI's ability to continue operating as a going concern. [Appellants] either fail to see, or willfully choose to ignore, that their real-world actions have real-world consequences. [Appellants'] actions and the specter of this litigation have alienated . . . Michael Toth, and caused key employees and business partners to leave LSI. This has hamstrung LSI's operations to the point where it formed no new contracts to provide services due to doubts that it would be able to perform. The Superior Court's stay order is not a magic salve that can preserve LSI as it existed before these events took place. Michael Toth cannot be forced to continue to work for LSI. U.S. Const. amend. XIII, § 1. Even if the Superior Court would reverse this Court's dissolution of LSI, there is simply no going back.

Particularly important, as it relates to LSI's iObservation software, Michael's stepping down as CEO caused a key partner in LSI's business, Dr. Robert Marzano ("Dr. Marzano"), to cease licensing his proprietary teacher evaluation model to LSI. In order to allow its clients to administer Dr. Marzano's model when evaluating teacher performance, LSI had developed a proprietary evaluation software, called iObservation. The iObservation software is one of LSI's few remaining assets. However, its value as an asset is largely, if not solely, tied to the concurrent licensure of Dr. Marzano's evaluation model.

Without being able to sell its iObservation software tool to school districts, and having formed no new contracts to provide services, Mr. Chiafullo made a calculated business decision to license the software in an attempt to generate some kind of revenue for LSI. Understandably, given its limited usefulness, the only market for

licensing the software is Michael's new company which works with Dr. Marzano. It should also be noted that **licensing** [the] use of the iObservation software for a period of 5 years is not the same as liquidating that asset. LSI remains the owner of that proprietary software. The alternative, which [Appellants] suggest was the better course of action, would have been to let the software remain unused and non-revenue-generating. The only conceivable motive [Appellants] have for suggesting this alternative is simply to stymie Michael's new enterprise out of spite, which is consistent with their *modus operandi* throughout this litigation.

Aside from the iObservation software, this [c]ourt also approved the sale of contracts under which LSI promised to rent convention room space at Disney Land. Because of LSI's current inoperative state of affairs, it had no ability or intention to honor those contracts, which immediately made them a liability. The contracts with Disney contained liquidated damages provisions that would have been triggered in the event of breach. Thus, Mr. Chiafullo again made a prudent decision to assign the contracts in order to avoid the potential for significant liability to LSI.

[Appellants] baldly assert in their statement of errors that the liquidated damages would never have been triggered without elucidating, either in their written filings or arguments before this [c]ourt, why the liquidated damages would not be triggered. [Appellants] only point out that Michael "unlawfully" manufactured the conditions under which LSI became unable to perform under these contracts. However, as already stated, this [c]ourt has no power to compel Michael, Dr. Marzano, or any other employees and business partners to continue working with LSI. Whether or not Michael's unilateral actions in leaving and starting a competing business are legally justifiable, that does not bear on Mr. Chiafullo's and this [c]ourt's obligation to preserve LSI in the condition it is presently in. Thus, while [Appellants] continue to grandstand about Michael's "self-dealing and maneuvering" they offer no alternative to avoiding the liability of the liquidated damages in the contracts. As such, this [c]ourt approved the assignment of those contracts.

Lastly, this [c]ourt also authorized the sale of some of LSI's store of physical assets, such as textbooks and tradeshow material. While LSI remains inoperable, these assets were useless and continuing to incur storage expenses in warehouses. These assets

were also depreciable. Therefore, this [c]ourt agreed with Mr. Chiafullo that maintaining these depreciable assets in storage facilities would only erode LSI's cash value to the detriment of all parties.

Trial Ct. Op., 7/5/23, at 5-9 (unpaginated) (emphases in original).

After review, we agree with the trial court's analysis and conclusion. Mr. Chiafullo's recommendations were consistent with the July 21, 2022 order appointing him and directing him to preserve LSI's assets and operate the business pending further direction by the trial court. *See* Trial Ct. Order, 7/21/22. Moreover, the trial court's April 19, 2023 order clearly did not permit Mr. Chiafullo to liquidate and dissolve LSI; rather, the April 19, 2023 order merely approved his limited recommendation to sell and license some of LSI's assets. *See* Trial Ct. Order, 4/19/23. Accordingly, we conclude that the April 19, 2023 order did not violate this Court's stay order, and we discern no abuse of discretion.

Finally, with respect to Appellants' assertion that Mr. Chiafullo's recommendation and the April 19, 2023 order approving the recommendation was a poor value to LSI and amounted to self-dealing, we conclude that no relief is due. The trial court stated:

Finally, in [Appellants'] last two statements of error — to the extent that they can be construed as assigning any legal error at all — take issue with the prudence or equity of this [c]ourt's decision to sell and license some of LSI's assets. Put simply, [Appellants] disagree with the business decision of the custodian. However, there is no legal standard or authority with which to analyze or evaluate the prudence of this business decision, and therefore [Appellants] have no basis to challenge this [c]ourt's order.

- 61 -

In examining the liability of a receiver for negligence or misconduct while operating the business under his or her care, our Supreme Court has said "[w]hile the receiver will be held to a rigid accountability, nothing more is required of him than that he act in good faith, and exercise the discretion and prudence of ordinarily careful men in pursuits of similar character." **Pa. Eng'g Works v. New Castle Stamping Co.**, 103 A. 215, 217 (Pa. 1918). . . .

\* \* \*

[T]his Court's supervisory role over Mr. Chiafullo should be sufficient to guard against the gross misconduct, "self-dealing," and "maneuvering" that [Appellants] seem to think is occurring. Although [Appellants] stated in their Objections to the Custodian's Recommendations that they "do not believe that Mr. Chiafullo is a willing participant" in [Appellees'] "self-serving arrangement," the implication to the contrary is clear. For the reasons stated above, Mr. Chiafullo's recommendations were soundly reasoned business decisions to generate revenue and avoid expenses and liability while LSI remains inactive. Therefore, this [c]ourt can find no abuse of discretion or error in approving Mr. Chiafullo's actions.

Trial Ct. Op., 7/5/23, at 9-10 (unpaginated) (footnote omitted). After review, we agree with the trial court that Appellants have not provided a legal basis upon which to conclude that the trial court erred or that Mr. Chiafullo acted in bad faith. **See**, **e.g.**, **Pa. Eng'g Works**, 103 A. at 217. Further, we agree with the trial court that Mr. Chiafullo made reasonably sound business recommendations aimed at preserving LSI's dwindling assets pursuant to the July 21, 2022 order, and we discern no abuse of discretion in the trial court's April 19, 2023 order. Accordingly, we affirm the order on appeal at 514 WDA 2023.

## **Conclusion**

For the reasons set forth herein, we affirm the orders of the trial court on appeal at 266 WDA 2022, 267 WDA 2022, 403 WDA 2022, 846 WDA 2022, and 514 WDA 2023. Jurisdiction is relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/27/2024